COPY - The original was filed in
the Clerk's Office at Charleston o

**JAN I 5 2016**

TERESA L. DEPPN  R. CLERK
U.S. District Court
Southern District of West Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA          )
*ex rel.* CATHY MCGEE and          )
    ANGELA MONROE          )
                  )
    Plaintiffs,          )
                  )          Case No: 2:16-0367
v.          )
                  )          **FILED UNDER SEAL**
AMEDISYS, INC.,          )          **DO NOT PLACE IN PRESS BOX**
                  )          **DO NOT ENTER ON PACER**
                  )          **DEMAND FOR JURY**
Defendant.          )

# UNDER SEAL

# DO NOT FILE
# WITH PACER

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>*ex rel.* CATHY MCGEE and )<br>ANGELA MONROE )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>AMEDISYS, INC., )<br> )<br> )<br> )<br>Defendant. ) | Case No: _____<br><br>**FILED UNDER SEAL**<br>**DO NOT PLACE IN PRESS BOX**<br>**DO NOT ENTER ON PACER**<br>**DEMAND FOR JURY** |

## *QUI TAM* COMPLAINT

Relators Cathy McGee and Angela Monroe, on behalf of themselves and the United States of America, allege and claim against Defendant Amedisys, Inc. as follows:

## INTRODUCTION

1.     Relators Cathy McGee and Angela Monroe are former Amedisys, Inc. employees who worked in Amedisys' Parkersburg, West Virginia location. Amedisys, Inc., a Louisiana-based for-profit company, is one of the nation's largest hospice and home health providers, treating approximately 380,000 patients

2

a year in 37 states, the District of Columbia, and Puerto Rico.[1]  Their 15,000 employees treat approximately 70,000 patients daily.[2]

2.     In 2014, Amedisys agreed to pay $150 million to the federal government to resolve allegations that it violated the False Claims Act by submitting fraudulent billings from its home health division to the Medicare program.[3]  The settlement resolved allegations that between 2008 and 2010, Amedisys home health offices fraudulently billed Medicare for ineligible patients and services – specifically, for home health nursing and therapy services that were medically unnecessary to patients who were not homebound, all in an effort to maximize its Medicare payments.[4]  These violations were the result of corporate management's pressure on its nurses and therapists to make patient care decisions to prioritize financial benefit to Amedisys – not the needs of the patients. Additionally, the settlement resolved allegations that Amedisys established and maintained financial relationships with its referring physicians in violation of the Anti-Kickback and Stark Statutes.

3.     The settlement also dictates that Amedisys' home health division will operate under a Corporate Integrity Agreement ("CIA") with the Department of

---

[1] http://www.amedisys.com/assets/pdfs/amedisys_overview.

[2] http://www.amedisys.com/assets/pdfs/amedisys_overview.

[3] http://www.justice.gov/opa/pr/amedisys-home-health-companies-agree-pay-150-million-resolve-false-claims-act-allegations.

[4] http://www.justice.gov/opa/pr/amedisys-home-health-companies-agree-pay-150-million-resolve-false-claims-act-allegations.

Health and Human Services. The CIA implements compliance and oversight measures designed to avoid or promptly detect fraudulent conduct.[5]

4.      In light of its previous fraudulent behavior and resulting legal and financial woes, one would expect Aedisys to amend its corporate practices. As described below, however, Amedisys continues to commit fraud to maximize its payment from Medicare. Any "reform" has not reached Amedisys' hospice division: Amedisys continues to pressure its nurses to admit patients that do not meet the criteria necessary for hospice care, admit and fail to discharge nonterminal patients, pressure patient families to place their nonterminal family members in hospice, and falsify documentation to demonstrate eligibility and maximize reimbursement – all in an effort to defraud Medicare and all in violation of the False Claims Act, Anti-Kickback Statute, and Stark Act.

5.      Specific examples of the evidence of Amedisys' fraudulent scheme include the following:

- ■      Amedisys admits patients for general inpatient ("GIP") hospice care without any documentation suggesting that these patients' care needs could not be managed at home and meet the threshold required to qualify for GIP care – thereby increasing their reimbursement for those patients and offsetting their wrongdoing in

---

[5] Id.

4

the in-home hospice setting by increasing their aggregate cap. Moreover, admission nurses are instructed to "strongly encourage" patients' referring physicians to place patients on an morphine IV drip to make the patient eligible for admission to GIP hospice care. Amedisys also "admits" and seeks reimbursement for patients who have already expired, in an effort increase their enrollment numbers to offset their aggregate cap liability.

- Within its GIP hospice program, Amedisys operates a kickback scheme with the Camden Clark Medical Center in Parkersburg, West Virginia. Camden Clark funnels GIP hospice referrals to Amedisys, regardless of the patients' eligibility or needs with respect to hospice care. Those patients' eventual deaths do not count against the Camden Clark's mortality rate, and Amedisys profits from those patients, both in terms of payout and in decreasing its aggregate cap liability. When Relator Monroe questioned the validity of some of Camden Clark's GIP referrals, an Amedisys senior administrator stated, "Camden Clark is a large referral source. We need to make them happy and they will make us happy."

- When a patient appears no longer to be eligible for hospice services, Amedisys instructs its registered nurse case managers to keep the patient on service until the end of the next certification period, regardless of the length of time remaining in the current period. Amedisys also instructs its case managers to "continue to flesh out areas of potential decline – just in case."

- Amedisys instructs its nurses not to discuss ineligible patients with the Hospice Medical Director during weekly interdisciplinary team ("IDT") meetings. Relator Monroe has encountered patients who do not meet Medicare guidelines for admission to hospice services, either at the time of their admission or presently. These patients, described below, merely suffer from nonterminal conditions such as osteoarthritis, mild anxiety, or difficulty in procuring transportation to doctors' appointments – none of which qualify for hospice care. Still, Amedisys instructs Monroe and other nurses to keep these patients on hospice service for a minimum of 180 days, reasoning that Medicare is not likely to submit an additional development request ("ADR") for patients with a stay of less than 180 days, and argues, "it's all a big game; Medicare just doesn't want to pay."

   Amedisys has kept some of these nonterminal patients on hospice service for three years.

■   Amedisys falsifies patient documentation and submits such false documents for Medicare reimbursement, including documentation of volunteer visits, face-to-face encounters with physicians, recertification orders, and service as needed ("PRN") visits.

   6.  Paul Kusserow, Amedisys' President and CEO, stated in his 2014 Annual Report to Amedisys' shareholders that, "We are clearly on the other side of our turnaround, and Amedisys is a revitalized company."[6] Despite this alleged "revitalization," Amedisys utterly has failed to reform its conduct since the implementation of the CIA and indeed, promulgates a corporate culture of defrauding Medicare. Moreover, Relators provide examples of specific individual false claims submitted by Amedisys and paid by Medicare, as well as the details of Amedisys' prolonged, multi-act scheme to submit false claims in violation of the False Claims Act and to participate in kickback schemes in violation of the Anti-Kickback Statute and Stark Act.

---

[6] http://investors.amedisys.com/phoenix.zhtml?c=64257&p=irol-reportsannual.

## JURISDICTION AND VENUE

7.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

8.     Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendant qualifies to do business in the state of West Virginia, transacts substantial business in the state of West Virginia, transacts substantial business in this judicial district, and can be found here. Additionally, and as described herein, Defendant committed within this judicial district acts proscribed by 31 U.S.C. § 3729. Specifically, Defendant submitted and caused to be submitted within this judicial district false claims to Medicare for hospice care unnecessarily for ineligible patients and submitted or used false records material to such claims.

## PARTIES

9.     Defendant Amedisys is one of the nation's largest hospice providers, operating from 37 states, Washington D.C., and Puerto Rico, and offering hospice services to approximately 70,000 patients daily in private homes, nursing facilities, assisted living facilities, and hospitals. In 2014, Amedisys paid the United States $150 million to settle allegations of improper billing for patients ineligible for the Medicare home health benefit and entered into the CIA. Through their employment at Amedisys, and as described herein, Relators have direct personal knowledge that

8

Amedisys continues to defraud Medicare through its hospice services division and has enacted a multi-act scheme to submit false claims in violation of the False Claims Act.

10.    Relator Angela Monroe is a registered nurse. She was employed by Amedisys Hospice from August 13, 2012 until August 14, 2015. She currently works as an RN for Davita, Inc. In the course of her duties with Amedisys, Ms. Monroe learned that Amedisys fraudulently bills Medicare for ineligible hospice patients. Ms. Monroe became increasingly concerned by the intense pressure applied by Amedisys corporate management to achieve and maintain unrealistic referral and enrollment goals, by the fraudulent charting of patient symptoms and conditions to make patients appear hospice-eligible when they are in fact not, and by the pressure applied by Amedisys to keep ineligible patients on hospice service. Ms. Monroe's personal experience as an Amedisys nurse has convinced her that Amedisys' corporate practices are designed to fraudulently inflate Medicare billing in violation of the False Claims Act. Ms. Monroe resigned from her position at Amedisys when she realized that reporting its wrongdoing internally would be fruitless. In her words, Amedisys' internal fraud reporting hotline proves nothing more than the "self-termination hotline."

11.    Relator Cathy McGee is a family nurse practitioner.    She was employed by Amedisys Hospice Parkersburg from September 2010 until August 3, 2012 as a clinical manager.  Amedisys terminated her employment in August 2013.

12.    Prior to filing this Complaint, Relators voluntarily disclosed to the United States the information upon which this action is based.  To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A), Relators are the original source of the information for purposes of that section. Alternatively, Relators have knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relators voluntarily provided that information to the Government before filing this Complaint.  Relators are serving contemporaneously herewith a statement of the material evidence in their possession upon which their claims are based.

## THE MEDICARE HOSPICE BENEFIT

### I.    Background

13.    Through the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., the United States provides health insurance coverage for eligible citizens.  The United States Department of Health and Human Services, specifically the Center for Medicare and Medicaid Services ("CMS") oversees the administration of Medicare.

14.    Through the Medicare Hospice Benefit, Medicare pays for hospice care for certain terminally ill patients who elect to receive such care.  *See* 42 U.S.C. § 1395d.  A patient is deemed to be terminally ill if the patient "has a medical prognosis such that his or her life expectancy is 6 months or less if the disease runs its normal course."  42 C.F.R. § 418.3.  In electing hospice care, a patient must agree to forego Medicare coverage for curative treatment.  *See* 42 U.S.C. § 1395d.  A patient may at anytime revoke his or her hospice election and resume Medicare Part A coverage.  42 C.F.R. § 418.28.

15.    Amedisys' aggressive, profit-maximizing business model represents an intrusion of greed into an institution founded upon philosophical, spiritual, and medical notions of charity and care-giving.  The impetus for the modern hospice movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 On Death and Dying is acknowledged to have altered modern perceptions about care for the terminally ill.  In the 1970s, the first hospice facilities opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminal patients.  Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the families and the patients the spiritual, emotional, and financial help in order to facilitate the final care at home."  In 1982, Congress

created a provisional Medicare Hospice Benefit, made permanent in 1986. By 1990, 800 hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

16.    From such humble, altruistic roots, hospice care has become big business. Medicare hospice payments rose from $205 million in 1989 to $9.2 billion in 2006 and are estimated to be $15 billion at the time of the filing of this complaint.[7] In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the *New York Times* recognized that the hospice infrastructure "was never designed to handle the expanding network of nursing homes, hospices, assisted-care centers and other services popping up to serve the nation's growing aging population." Since then, the situation has only gotten much worse: in late 2013, *The Washington Post* issued an investigative report entitled, "Hospice Firms Draining Billions from Medicare," revealing that "over the past decade, the number of 'hospice survivors' in the United States has risen dramatically, in part because hospice companies earn more by recruiting patients who aren't actually dying." *The Washington Post* article drew its conclusions from data collected by hospices in California, but venture capitalists and other investors all across the country have been quick to perceive that hospice represents a potentially unlimited stream of income for those

---

[7] "Medicare Hospice Payment Reform: Analyses to Support Payment Reform." A Report Prepared for Centers for Medicaid and Medicare Services. Prepared by ABT Associates, Inc. May 1, 2014. p. 8. https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/Hospice/Downloads/May-2014-AnalysesToSupportPaymentReform.pdf.

who bring aggressive marketing, sales, and growth tactics into the new industry of care for the dying. Relators experienced through their personal first-hand knowledge and observations that Amedisys is among the corporations who are fraudulently using hospice as a profit center by presenting false claims for *per diem* reimbursements for patients that they knew or should have known did not qualify for the Medicare hospice benefit.

## II. Hospice Benefits, Reimbursements, and Requirements

17. Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician. *See* 42 C.F.R. § 418.22. Hospice is designed to provide pain relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis. Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness. *See* 42 C.F.R. § 418.202.

18. Through Medicare and/or Medicaid (indirectly through the states), the United States reimburses hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled. 42 C.F.R. § 418.302. Medicare or Medicaid makes a daily payment, regardless of the amount

13

of services provided on a given day and even on days when no services are provided. Payments are made according to a fee schedule with four base payment amounts for the four different categories of care: routine home care ("RHC"), continuous home care ("CHC"), in-patient respite care ("IRC"), and general in-patient care ("GIP").

19.    In return for the hospice *per diem* payment, hospice providers are obligated to provide patients with all covered palliative services. *See* 42 C.F.R. § 418.202. The hospice must design a plan of care ("POC") inclusive of all covered services necessary to meet the patient's needs. *See* 42 C.F.R. § 418.56. That POC must be in place prior to the hospice submitting a Medicare bill.

20.    Medicare imposes on hospice providers an annual per-patient average cap for reimbursements (the "Aggregate Cap"). The Aggregate Cap is set by CMS according to federal regulations, and in 2014 stood at $26,725.79 per patient. The Aggregate Cap is not related to expenditures on individual patients. Rather, it limits the aggregate reimbursement a provider may receive from Medicare. A hospice provider's compliance is calculated by dividing its total submitted reimbursements over a year by the number of non-duplicative patients enrolled during that year. Thus, every first-time Medicare hospice patient enrolled increases a hospice's Aggregate Cap amount by $26,725.79.

14

21. Medicare will not pay for hospice services provided to patients who are not terminally ill. *See* 42 U.S.C. §1395y. The hospice medical director and the patient's attending physician must certify that the patient is terminal prior to the patient's admission to hospice. 42 C.F.R. §418.25. Furthermore, it is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50. Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for the profit of the provider. *Id.*

22. Within the hospice framework, the Center for Medicaid and Medicare Services ("CMS") establishes fixed payment amounts for the following specific categories of covered hospice care: (1) routine home care day, (2) continuous home care day, (3) inpatient respite care day, (4) general inpatient care day. 42 C.F.R. §418.302(a)(b). For 2015, the rate for general inpatient care for hospice providers who submit required quality data to CMS was $708.77 per day, per patient.

23. GIP care is reserved for pain control and symptom management provided in an inpatient facility when a patient's pain or symptoms cannot be

15

managed in another setting.[8]  The care is intended to be short-term and is the

second most expensive level of hospice care.  CMS has expressed concern about

possible misuse of GIP, including care being billed for but not provided, long

lengths of stay, and beneficiaries receiving unnecessary care.  Medicare paid $1.1

billion for GIP in 2011.[9]

24.     To enroll as a Medicare provider, Amedisys was required to submit a

Medicare Enrollment Application for Institutional Providers.  *See* CMS Form

855A.  In submitting Form 855A, Amedisys made the following "Certification

Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and
> program instructions that apply to this provider. The
> Medicare laws, regulations, and program instructions are
> available through the Medicare contractor. I understand
> that payment of a claim by Medicare is conditioned upon
> the claim and the underlying transaction complying with
> such laws, regulations, and program instructions
> (including, but not limited to, the Federal Anti-Kickback
> statute and the Stark law), and on the provider's
> compliance with all applicable conditions of participation
> in Medicare.

Form CMS-855A.

25.     Amedisys then billed Medicare by submitting a claim form (CMS

Form 1450) to the FI responsible for administering Medicare hospice claims on

behalf of the United States. *See* CMS Form 1450.  Each time it submitted a claim

---

[8] *See* Memorandum Report:  Medicare Hospice:  Use of General Inpatient Care from Deputy Inspector General to CMS.  May 3, 2013.  http://oig.hhs.gov/oei/reports/oei-02-10-00490.pdf.
[9] Id.

to the United States through the FI, Amedisys certified that the claim was true, correct, and complete, and complied with all Medicare laws and regulations.

## AMEDISYS' FRAUDULENT SCHEME

26.    From at least 2012 to the present, Amedisys has defrauded the United States by submitting, or causing to be submitted, false or fraudulent claims to Medicare for ineligible hospice patients and by its failure to report past overpayments for ineligible patients and to reimburse Medicare for these overpayments.

27.    As a result of the Amedisys' submission of, or causing the submission of claims that were knowingly false, or submitted with reckless disregard or deliberate ignorance of their falsity and through Amedisys' "knowing" concealment or avoidance of its obligation to the Government, the United States was damaged by reimbursing Amedisys for providing hospice care to patients that were not eligible for the hospice benefit and by the failure of Amedisys to make repayments that Amedisys knew were due and owing.

28.    Amedisys acted with intentional disregard, reckless disregard, or deliberate ignorance to the statements of staff as well as their own records regarding the presence within Amedisys hospice census of ineligible patients.

29.    Moreover, the nature of Amedisys' scheme was prolonged, multi-act, and company-wide.

30.    As a result, Medicare paid Amedisys monies that should not have been paid, and Amedisys retained payments that should have been returned to Medicare.

I.    **Amedisys Bills Medicare for Ineligible Hospice Patients.**

31.    Amedisys systematically defrauds Medicare and Medicaid by recruiting and cycling non-qualifying patients through its hospice program.

32.    Accordingly, Amedisys is aware, or should be aware, of the admission of ineligible patients.

33.    Amedisys' senior administrators have told Relator Monroe and other RN case managers to keep all patients who have been identified as "chronic/nonterminal" (and thus, no longer hospice-eligible) on service for at least 180 days, reasoning that Medicare is not likely to submit at ADR for patients with a stay of less than 180 days. Amedisys Area Vice-President Heather Price stated, "it's all a big game, Medicare just doesn't want to pay."

34.    These patients, described in detail below, do not and did not upon admission meet Medicare requirements for hospice care. They have demonstrated no decline since admission, and the primary management of these patients' care consists of management of chronic, nonterminal issues such as osteoarthritis, mild anxiety, or family difficulty in transporting the patient to doctor appointments. Some of these patients have remained on hospice service for three years.

18

35. Moreover, Amedisys senior management instructs its nurses not to discuss any patient ineligibility with the Hospice Medical Director during weekly IDT meetings.

36. The following patients are examples of patients that Amedisys admitted and billed for to Medicare despite the knowledge that the patients were ineligible for hospice:

37. Patient J.D., a male, was admitted on 3/13/2105 with a diagnosis of atheroschlerotic heart disease ("ASCVD"). The patient has a medical history that included sustained ventricular tachycardia, which was resolved with the insertion of an automatic implantable cardioverter defibrillator several years prior to his admission to hospice. The patient also has a history of an underlying anxiety disorder. The patient was not eligible for hospice upon admission. Specifically, upon admission, the patient was ambulatory, required no supplemental oxygen, denied chest pain, and the medication prescribed for treatment of his ASCVD was minimal. Over the first 90-day benefit period, the patient remained ambulatory, required no supplemental oxygen, and denied any episodes of chest pain. His RN case manager moved for discharge, but Amedisys instructed her to keep the patient on service for the second benefit period, "just in case he declined." When the patient did not decline in the second benefit period, his RN case manager again moved for his discharge. She was instructed by Area Vice-President Heather Price

19

via Director of Operations Rachelle Jackson to keep the patient on hospice service because his underlying anxiety disorder (for which he was prescribed one 0.25 mg Ativan daily) could exacerbate his heart condition.

38.    Patient E.O., a female, was admitted to hospice service on 2/2/2015 with a diagnosis of congestive heart failure ("CHF"), with a documented cardiac ejection fraction ("EF") of greater than 30%. The patient was not eligible for hospice upon admission.    Specifically, upon admission, the patient was ambulatory, lived alone, and provided the majority of her care.    The patient required only occasional use of supplemental oxygen.    The patient has been on hospice service for nearly one year, but has had no decline in her condition, remains ambulatory, and is still able to provide her own care.    The patient has no exacerbation CHF, denies chest pain, and continues to require supplemental oxygen only occasionally.    The only medication adjustment the patient has required is an increase in pain medication (Lortab/Vicodin) to manage her osteoarthritis.    When the patient's RN case manager questioned the patient's hospice eligibility, she was instructed that the hospice service was necessary to "manage the patient's pain."

39.    Patient D.H, a female, was admitted to hospice in September 2012 with a diagnosis of dementia. The patient has been on hospice service for over three years. During that time, she has demonstrated no further decline, has had no

decubitus ulcers (bed sores), no episodes of aspiration typically seen in dementia patients, no weight loss, no change in medications, and no supplemental oxygen use.

40.    Patient J.M., a female, was admitted to hospice service over one year ago, with a diagnosis of chronic obstructive pulmonary disease ("COPD"). The patient was not eligible for hospice upon admission. Specifically, upon admission, the patient used supplemental oxygen and breathing treatments only as needed. CMS guidelines require a resting room air Spo2 of less than 88% and continuous oxygen use for hospice admission under a COPD diagnosis. The patient was ambulatory with a cane (necessitated by underlying Parkinson's symptoms). After a year on hospice, the patient has experienced no exacerbation of COPD, uses supplemental oxygen as needed, and has required no changes in medication. The patient remains on hospice service, despite demonstrating no decline.

41.    Patient R.R., a male, was admitted 5/12/2015 with a diagnosis of ASCVD. The patient was not eligible for hospice upon admission. Specifically, upon admission, the patient was ambulatory, required no supplemental oxygen, and was prescribed minimal medication for heart disease. During the second benefit period, a cardiologist cleared the patient to undergo surgery to remove a pain medication pump. The patient remains ambulatory, requires no supplemental

21

oxygen, has had no episodes of chest pain or evidence of decreased cardiac endurance. The patient remains on hospice service.

42.    Patient D.F., a male, was admitted to hospice on 4/21/2015 with a diagnosis of COPD/pulmonary fibrosis. The patient was not eligible for hospice upon admission. Specifically, the patient did require continuous supplemental oxygen. Furthermore, the patient continues to receive curative treatment from his primary care physician – which should automatically disqualify him from hospice services.

43.    Patient D.P., a female, was admitted to hospice on 5/16/2015 with congestive heart failure. The patient was not eligible for hospice upon admission and has demonstrated no decline. Specifically, upon admission, the patient was observed to have pronounced hypotension for which she was asymptomatic – i.e., the patient experienced no change in consciousness or dizziness. The patient has had no exacerbations of CHF, denies chest pain, denies shortness of breath, remains hypotensive but asymptomatic, and has required no change in medication. The patient is in her third benefit period and remains on hospice.

44.    Patient R.P., a female, was admitted to hospice 1/19/2015 with a diagnosis of late effect cerebrovascular disease (i.e., the residual condition that remains after recovery from the acute phase of a stroke). The patient was not eligible for hospice upon admission. Specifically, upon admission, the patient was

alert and oriented, able to transfer from bed to chair with one person's assistance, was conversational, able to eat some soft foods and required tube feedings for supplemental nutrition. While on hospice service, the patient's condition has not declined – she has demonstrated no aspiration, no change in mental or neurologic function, and no weight loss. The patient remains on service.

45.    Patient T.Y., a female, was admitted to hospice for the third time on 3/17/2015 with a dementia diagnosis.    The patient's condition at this third admission was unchanged from her condition at her previous live discharge for ineligibility in late 2012. The patient is able to sit in a wheelchair unassisted. The patient demonstrates no evidence of decline during this admission. Specifically, the patient has demonstrated no further decline in neurologic or muscular status, no aspiration, no decubitus ulcers, and no weight loss. The patient continues to receive 24-hour nursing care in a long-term care facility.

46.    Patient T.S., a female, was admitted to hospice 6/17/2015 with a COPD diagnosis. The patient was not eligible for hospice upon admission. Specifically, on admission, the patient had a room air SpO2 of 96% with occasional oxygen use, was ambulatory, lived alone, and was able to perform all activities of daily living. Despite being on medications for treatment of COPD, the patient was admitted at the Director of Operations' insistence because the patient is the grandmother-in-law of an Amedisys Care Transition Coordinator. The patient

has demonstrated no decline, no increase in oxygen use or other exacerbation of COPD, and remains able to perform all activities of daily living. The patient has been prescribed no medications generally used for the treatment of end stage COPD and remains ineligible for hospice.

47.    Patient V.G., a male, was admitted on 5/28/2015 with a diagnosis of multiple sclerosis.  The patient was not eligible for hospice upon admission. Specifically, on admission, although having been bed bound for several years, the patient was able to feed himself.  Since admission, there has been no weight loss, increase in decubitus ulcers, infections, changes in medications, or other evidence of decline.  Nonetheless, the patient has been recertified for hospice multiple times.

48.    Patient J.K., a female, was admitted to hospice with a diagnosis of non-mestastic breast cancer. The patient was not eligible for hospice upon admission.  Specifically, the patient was ambulatory, lived alone, and was able to perform all activities of daily living. Despite being on hospice service for over 18 months, the patient has demonstrated no decline and remains able to perform all activities of daily living.

49.    Patient C.W., a male, was admitted to hospice in 2014 with a diagnosis of dementia.  The patient was not eligible for hospice upon admission. Specifically, the patient was able to transfer himself from the bed to the chair with assistance, was conversational, and was able to feed himself.  Despite being on

hospice for over year, the patient never demonstrated any decline, and was ultimately discharged alive in October 2015 after receiving two ADRs from Medicare.

50.    Patient G.J., a female, was admitted to hospice in June 2014 with a diagnosis of COPD, but also suffers from age-related dementia. The patient was not eligible for hospice upon admission. Specifically, upon admission, the patient required only occasional supplemental oxygen. The patient has demonstrated no decline in respiratory function since admission and continues to use oxygen only occasionally. Amedisys senior managers instructed the patient's case managers to keep the patient on services "in case her dementia worsened," at which time her diagnosis could be "switched" to dementia. The patient has received two ADRs from Medicare.

51.    Patient L.S., a female, was admitted to hospice in July 2012 with a diagnosis of dementia. Despite being on hospice for over three years, the patient demonstrated no decline. The patient expired in October 2015 after an acute cardiac event unrelated to her dementia diagnosis.

52.    On or about August 27, 2015, Amedisys evaluated a female patient for admission to hospice with a dementia diagnosis. When the patient did not meet Medicare guidelines for admission to hospice under that diagnosis, the nurse was instructed to admit the patient under the terminal diagnosis of Late Effect CVA

(cerebrovascular disease, i.e., the residual condition that remains after recovery from the acute phase of a stroke). The patient presented no neurological deficits and had no documented medical history of ever having a stroke. The admitting nurse refused to complete the admission. Instead, Amedisys Director of Operations Rachelle Jackson ordered another nurse to complete the patient's fraudulent admission.

53. On or about August 31, 2015, a female patient was evaluated for admission with a diagnosis of dementia, after being brought in by Account Executive Donna Saper. The attending Care Transition Coordinator was unsure if the patient qualified for admission under that diagnosis. Amedisys' Director of Operations Rachelle Jackson sent a RN case manager to evaluate, but when the RN case manager determined that the patient did not meet Medicare guidelines for dementia, Amedisys' Area Vice-President Heather Price instructed the nurse to complete the patient's admission under that fraudulent diagnosis.

54. On or about August 29, 2015, the Amedisys RN case manager for the Parkersburg, West Virginia office received a referral from the Marietta, Ohio office for a female cancer patient under the care of Dr. Kelly Cawley. The patient was admitted to hospice service. Dr. Cawley later called to ask why her patient was admitted to hospice without her order or approval. *See* 42 C.F.R. § 418.22 (c)(1)(ii) (a hospice must obtain written certification of a patient's terminal illness

from the patient's attending physician prior to admitting that patient to hospice). The patient remains on hospice while receiving curative chemotherapy, a measure which itself renders the patient ineligible for hospice care. *See* 42 C.F.R. § 418.24(d) (a patient receiving hospice care waives the right to Medicare reimbursement for curative treatment).

## II.    Amedisys Bills Medicare for Patients Ineligible for GIP service.

55.    Amedisys fraudulently places patients on GIP hospice service when they do not qualify for that benefit to receive the much higher reimbursement level for that service.

56.    Amedisys also uses these patients to boost their enrollment numbers, thereby fraudulently decreasing their aggregate cap liability to avoid reimbursing Medicare for overpayment.

57.    Moreover, Amedisys maintains a kickback scheme with Camden Clark Medical Center in Parkersburg, West Virginia, to maximize its GIP admissions.

58.    Relator Monroe's review of patient records concluded in the vast majority Amedisys' patients on GIP service, imminent death was the only presenting symptom. No documentation exists in these patients' charts (listed below) to indicate that their hospice care could not be managed at home, at a fraction of the cost (and moreover, without consideration of the needs and desires

27

of the patient or the patient's family). GIP care is reserved for short-term pain control and symptom management provided in an inpatient facility when a patient's pain or symptoms cannot be managed in another setting and is meant constitute no more than 20% of a patient's total hospice benefit.[10]

59.    The majority of patients of the patients listed in paragraphs 66 through 112 were admitted to GIP hospice services under the terminal diagnosis of Acute Respiratory Failure or Chronic Respiratory Failure. A typical patient eligible for GIP under those diagnoses would present: shortness of breath, a respiratory rate of greater than 40 breaths per minute, shallow irregular respirations (also known as Cheyne Stokes respirations), a heart rate of greater than 120 beats per minute, blood pressure lower than 90/60, "terminal restlessness," in which a patient thrashes in the bed or attempts to get out of bed, inability to self-manage oral secretions (also known as a "death rattle"), and levels of consciousness varying from unresponsive to awake but confused and combative.

60.    These symptoms described above are required documentation points in Amedisys' system to list a patient as "Actively Dying" -- i.e., every patient who has died at home while under the care of Amedisys Hospice has presented at least some of the above symptoms and was managed at home. Accordingly, any patient admitted to GIP hospice care should not only present the above-listed symptoms,

---

[10] *See* Memorandum Report: Medicare Hospice: Use of General Inpatient Care from Deputy Inspector General to CMS. May 3, 2013. http://oig.hhs.gov/oei/reports/oei-02-10-00490.pdf.

but also an acute and severe exacerbation of them to qualify under CMS guidelines for GIP care.

61.    Amedisys, however, admitted patients, including those listed below, to GIP hospice who were either unresponsive and <u>without</u> signs and symptoms of distress, or were awake and able to communicate clearly with family and nursing staff.  In both cases, Amedisys fraudulently charted GIP patients' symptoms as "uncontrolled," when, in fact, patients' vital signs were within normal limits, respirations were documented as "even and unlabored," and supplemental oxygen generally was not used – in other words, the patient's symptoms were controlled.

62.    To circumvent Medicare's GIP requirements, and maximize its reimbursement from Medicare, Amedisys places its prospective patients at Camden Clark on morphine IV drips <u>prior to hospice referral</u>, despite the fact that these patients present no uncontrolled pain symptoms, all in an effort to "meet criteria for admission to GIP."  Camden Clark apparently supports the rush to inpatient hospice care as once a patient is admitted inpatient hospice care, the patient's death does not count toward the medical center's mortality rate. A senior administration official stated to Relator Monroe:  "Camden Clark is a large referral source, we need to make them happy and they will make us happy."

63.    Moreover, to maximize its enrollment numbers, Amedisys instructs its nurses to continue admission assessments, even if the patient expires before actual

admission occurs. Amedisys then seeks and obtains Medicare reimbursement for its "care" of these patients.

64.    Amedisys also uses the late patient's "admission" as an additional enrollment, thereby fraudulently increasing its aggregate cap and increasing the amount of reimbursement it can fraudulently retain from Medicare.

65.    The following patients are examples of patients who were improperly admitted to GIP care:

66.    Patient A.W., date of birth 4/21/1915, on GIP service from 2/20/2013 until 2/24/2013.

67.    Patient C.F., date of birth 10/4/1946, on GIP service from 2/22/2013 until 2/24/2013.

68.    Patient F.M., date of birth 11/27/1934, on GIP service 3/6/2013 until 3/7/2013.

69.    Patient R.W., date of birth 5/28/1954, on GIP service 5/11/2013 until 5/12/2013.

70.    Patient L.A., date of birth 8/14/1939, on GIP service 5/13/2013 until 5/14/2013.

71.    Patient R.A., date of birth 4/21/1935, on GIP service from 7/9/2013 until 7/14/2013.

72.    Patient M.H., date of birth 11/23/1931, on GIP service from 8/24/2013 until 8/27/2013.

73.    Patient M.E., date of birth 3/26/1931, on GIP service from 8/28/2013 until 8/29/2013.

74.    Patient R.H., date of birth 2/3/1939, on GIP service from 8/30/2013 until 8/30/2013.

75.    Patient L.P., date of birth 10/21/1937, on GIP service from 9/5/2013 until 9/7/2013.

76.    Patient R.J., date of birth 12/16/1943, on GIP service from 9/17/2013 until 9/18/2013.

77.    Patient D.S., date of birth 11/12/1931, on GIP service from 10/23/2013 until 10/29/2013.

78.    Patient D.T., date of birth 10/21/1945, on GIP service from 10/24/2013 until 10/25/2013.

79.    Patient S.C., date of birth 7/31/1975, on GIP service from 12/17/2013 until 12/21/2013.

80.    Patient V.H., date of birth 5/15/1930, on GIP service from 1/3/2014 until 1/5/2014.

81.    Patient W.C., date of birth 6/6/1935, on GIP service from 1/10/2014 until 1/16/2014.

82.    Patient M.D., date of birth 10/1/1925, on GIP service from 1/15/2014 until 1/16/2015.

83.    Patient O.S., date of birth 4/9/1922, on GIP service from 1/27/2014 until 2/2/2014.

84.    Patient W.R., date of birth 9/24/1929, on GIP service from 1/30/2014 until 1/31/2014.

85.    Patient W.S., date of birth 6/30/1935, on GIP service from 1/30/2014 until 1/31/2014.

86.    Patient M.L, date of birth 4/7/1929, on GIP service for 3/1/2014 (the patient expired on the date of admission).

87.    Patient C.D., date of birth 4/12/1972, on GIP service from 3/31/2014 to 4/4/2014.

88.    Patient B.H., date of birth 10/15/1937, on GIP service from 4/11/2014 until 4/13/2014.

89.    Patient C.S., date of birth 7/23/1924, on GIP service from 4/14/2014 until 4/15/2014.

90.    Patient M.P., date of birth 3/2/1935, on GIP service from 5/13/2014 until 5/18/2014.

91.    Patient D.G., date of birth 1/4/1935, on GIP service from 5/19/2014 until 5/20/2014.

92.     Patient D.C., date of birth 3/14/1936, on GIP service from 5/22/2014 until 5/25/2014.

93.     Patient J.H., date of birth 12/5/1922, on GIP service from 6/3/2014 until 6/8/2014.

94.     Patient D.S., date of birth 8/29/1933, on GIP service from 6/4/2014 until 6/6/2014.

95.     Patient E.W., date of birth 8/17/1937, on GIP service from 7/11/2014 until 7/20/2014.

96.     Patient D.T., date of birth 12/19/1950, on GIP service from 7/17/2014 until 7/19/2014.

97.     Patient K.B., date of birth unknown, on GIP service from 7/21/2014 until 7/22/2014.

98.     Patient M.W., date of birth 9/28/1947, on GIP service from 8/12/2014 until 8/16/2014.

99.     Patient L.Y., date of birth 8/7/1932, on GIP service from 8/25/2014 until 8/26/2014.

100.    Patient E.F., date of birth 9/6/1920, on GIP service from 9/27/2014 until 10/2/2014.

101.    Patient J.T., date of birth 9/5/1932, on GIP service from 10/9/2014 until 10/9/2014.

102. Patient P.H., date of birth 4/22/1929, on GIP service from 10/19/2014 until 10/20/2014.

103. Patient W.C., date of birth 4/7/1938, on GIP service on 11/4/2014 (the patient expired on the date of admission).

104. Patient G.C., date of birth 5/29/1956, on GIP service from 11/17/2014 until 11/18/2014.

105. Patient C.S., date of birth 1/17/1923, on GIP service from 1/14/2015 until 1/21/2015.

106. Patient B.J., date of birth 11/19/1949, on GIP service from 2/28/2015 until 3/5/2015.

107. Patient H.G., date of birth 7/4/1924, on GIP service from 3/23/2015 until 3/24/2015.

108. Patient R.W., date of birth 8/22/1934, on GIP service on 5/1/2015 (the patient expired on the date of admission).

109. Patient B.B., date of birth 5/17/1952, on GIP service from 6/8/2015 until 6/10/2015.

110. Patient L.A., date of birth 8/23/1931, on GIP service from 6/15/2015 until 6/18/2015.

111. Patient B.S., date of birth 7/24/1945, on GIP service from 7/19/2015 until 7/21/2015.

112. Patient C.G., date of birth 3/20/1943, on GIP service on 7/20/2015 (the patient expired on the date of admission).

### III. Amedisys' Corporate Strategy and Culture are Designed to Incentivize and Pressure Nurses and other Employees to Admit Ineligible Hospice Patients and to Keep Them on Hospice Service.

113. Amedisys perpetrates its multi-act, nationwide scheme to recruit and bill for ineligible hospice patients by pressuring nurses and aides to falsely document patients' condition to indicate hospice eligibility and decline. Amedisys, while aware of these issues, has made no attempt to rectify them (indeed, the corporate culture ordains the scheme) or to refund any overpayments to the United States and instead continues to bill the United States with full knowledge that its claims are false.

114. Amedisys also systematically manipulates patient diagnoses so that patients appear to be eligible for the Medicare hospice benefit when they are not in fact eligible and instructs its employees to do the same.

115. When a patient is recognized as no longer eligible for hospice services, Amedisys instructs its RN case managers to keep the patient on hospice service until the end of the next certification period irrespective of the length of time until that date.

116. Moreoever, Amedisys instructs its case managers to <u>not</u> document ineligibility, and to "continue to flesh out areas of potential decline in documentation – just in case."

117. Amedisys also instructs its case managers that "if a patient is under 180 days [on hospice service] anyway, we're not likely to get an ADR from Medicare."

118. Amedisys Area Vice President Heather Price told Relator Monroe and other case managers "it's all a big game, Medicare just doesn't want to pay."

119. Amedisys instructs its nurses to not discuss any of their patients' ineligibility for hospice care with the Hospice Medical Director during weekly IDT meetings.

120. Patient documentation by Amedisys consistently reflects eligibility-level criteria until the last nursing visit prior to the patient's live discharge.

121. Nurses are instructed to complete a patient's enrollment into GIP hospice, even if that patient has already expired, in an effort to boost enrollment numbers and offset aggregate cap liability.

**IV.    Amedisys Falsifies and Alters Medical Records to Demonstrate Hospice Eligibility.**

122. Furthermore, Amedisys systematically alters documents patient records after the fact to demonstrate hospice eligibility, maintain hospice eligibility, and maximize its reimbursement from Medicare.

36

123. On June 25, 2015, it was discovered that none of Amedisys' Parkersburg hospice patients admitted from February 2015 had weekly documentation from Volunteer Services in the medical record. Amedisys Hospice Parkersburg has a policy that when a patient is admitted or recertified for hospice service, an order is made for weekly tuck-in calls and monthly "thinking of you" visits, to be completed and <u>documented</u> by a volunteer. Medicare reimburses Amedisys for these volunteer visits at a rate matching cost savings up to five percent. *See* 42.C.F.R. § 418.78.

124. When this lack of documentation of volunteer visits was reported to Amedisys' Director of Operations, she instructed the facility's Volunteer Coordinator (who is not eligible to make calls or submit them for reimbursement), that the Coordinator had 24 hours to get those visits documented in the patients' charts. The Volunteer Coordinator expressed that she, in fact, had no volunteers. Calls to the patients confirmed that no tuck-in calls or monthly visits had been made.

125. By June 26, 2015, all missing documentation of tuck-in calls and monthly visits were present in the patients' records. The documentation of visits were all signed by the Volunteer Coordinator's sister, who was listed as a "volunteer" working under the Volunteer Coordinator, although she had not spoken to the Volunteer Coordinator in over six months.

37

126. All of these falsified calls and visits were submitted to Medicare for maximum reimbursement/matching with the knowledge and participation of Amedisys' Director of Operations, Business Office Manager, and Business Office Secretary.

127. Additionally, Medicare hospice regulations require that a patient's record reflect a "face-to-face" visit with a physician or nurse practitioner upon admission to hospice (if the stay is anticipated to reach a third benefit period) and at the beginning of the third benefit period. 42 C.F.R. 418.22(a)(4). Amedisys Hospice Parkersburg's Business Office Manager, Aimee Miller, frequently does not submit the face-to-face documentation to Amedisys' Hospice Medical Director in a timely manner. To avoid having an untimely face-to-face visit, Miller will mark the relevant documentation as "returned" in the system (for subsequent submission to Medicare), without actual documentation of the face-to-face visit in the patients' charts.

128. To further cover its fraud, Amedisys' Business Office Manager will frequently change the date of a recorded face-to-face visit to indicate that it occurred before the patient's Certification of Terminal Illness ("COTI") date (as required by Medicare regulations), when the visit actually occurred after the COTI. *See* 42 C.F.R. 418.22(a)(1) and (2).

129. Medicare regulations also require that patient recertifications for any additional benefit period be ordered and documented by a physician. 42 C.F.R. 418.22(b)(3). Amedisys, however, schedules recertification visits for its hospice patients prior to receiving any order from a physician. Amedisys instructs its clinical managers to write the order for recertification after only the nurse has completed the visit, with the order for recertification dated for the same date as the nurse's visit, and without any visit, order, or explanation from a physician.

130. Moreover, recertification orders are to be charted and signed by a physician. 42 C.F.R. 418.22(b)(3)(iii). In March/April 2015, while working at Amedisys' Anmoore, West Virginia Care Center, Relator Monroe was instructed to process approximately 40 recertifications over a span of three days. Relator Monroe was instructed to verify the patients' recertification order, write the verbal order and enter it into Amedisys' computer system, create an individualized plan of care (as required by 42 C.F.R. 418.56(a)), and "lock" the chart for billing to Medicare, all on behalf of a physician she had neither met nor spoken to regarding patients she had neither seen nor examined. Amedisys then continued to bill Medicare for these improperly re-certified patients.

<u>COUNT ONE</u>
## <u>PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS UNDER 31 U.S.C. § 3729</u>

131. Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

132. By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, as follows:

(a)    Defendant submitted false claims for hospice care provided to patients whom Defendant knew did not meet Medicare or Medicaid requirements for Hospice, in violation of 42 U.S.C. §1395y;

(b)    Defendant submitted false claims for hospice care provided to patients who were not properly assessed by an RN or physician and in the absence of a legitimate care plan as required by 42 C.F.R. §§ 418.201; 418.56.

(c)    Defendant submitted false claims for hospice care provided to patients who were under the care of a treating physician, but who were not certified as terminally-ill by that physician and were instead admitted without his or her knowledge, in violation of 42 C.F.R. § 418.22(a) and (b).

(d)    Defendant submitted false claims for hospice services premised upon Defendant's fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere;

133. The United States paid the false claims described herein and summarized in paragraph 53(a)-(c).

134. Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of hospice patients and fraudulent billing of the United States through Medicare or Medicaid.

135. Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

41

<u>COUNT TWO</u>
<u>MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL</u>
<u>TO A FALSE CLAIM UNDER 31 U.S.C. § 3729</u>

136. Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

137. By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States as follows:

(a)    Defendant created and used false certifications of terminal illness; false patient charts designed to make patients appear terminally ill, when they were not; and other false records intended to support its fraudulent billing to the United States, all in violation of 42 U.S.C. §1395y and the Medicare regulations cited *supra*.

(b)    Defendant made false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid, including false certifications on CMS Forms 885A and 1450 as described *supra*, when Defendant was aware that its practices as described herein were in violation of Medicare payment prerequisites, including but not limited to 42 U.S.C. §1395y and the applicable LCDs.

42

138. The false records or statements described herein were material to the false claims submitted, or caused to be submitted, by Defendant to the United States.

139. In reliance upon Defendant's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

140. Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT THREE
## "REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(a)(1)(G)

141. Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

142. By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be

43

made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States:

     (a)    Defendant knew that it had received hospice *per diem* payments for patients who did not qualify for hospice, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States.

     (b)    Defendant fraudulently inflated its enrollment numbers through its GIP program to lower its aggregate cap liability, thereby wrongfully retaining money it should have repaid to the United States.

143.  As a result of Defendant's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT FOUR
## CONSPIRACY UNDER 31 U.S.C. § 3729(a)(3)

144. Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

145. Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment or approval as follows: Defendant knowingly certified and/or re-certified hospice patients whom it knew did not qualify for Medicare or Medicaid reimbursement and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

146. The United States paid Defendant for such false claims.

147. Defendant, in concert with its principals, agents, employees, subsidiaries, and other institutions did agree to submit such false claims to the United States.

148. Defendant and its principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare or Medicaid.

149. Defendant's fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States

equal to the amount paid by the United States to Defendant and others as a result of Defendant's fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Relators may be entitled.

Date:  January 15, 2016.


/s/ Robert J. D'Anniballe, Jr.
ROBERT J. D'ANNIBALLE, JR., ESQ.
West Virginia Bar No. 920
Pietragallo Gordon Alfano Bosick & Raspanti, LLP
333 Penco Road
Weirton, WV 26062
Telephone:  (304) 723-6314
Fax No.:      (304) 723-6317
E-Mail:       RJD@pietragallo.com

James F. Barger, Jr. (*pro hac pending*)
J. Elliott Walthall (*pro hac pending*)
**FROHSIN & BARGER, LLC**
2421 2nd Ave. N, Suite 1
Birmingham, Alabama 35203
Tel: 205.933.4006
Fax:  205.933.4008
jim@frobar.com
elliott@frobar.com
alan@frobar.com

46

## Certificate of Service

On this the 15 day of January, 2016, Plaintiff-Relators hereby certify that in

compliance with Rule 4 of the Federal Rules of Civil Procedure, service of the *Qui*

*Tam* Complaint has been executed as follows:

**By Certified Mail to:**

United States Attorney
Carol A. Casto
300 Virginia Street
Charleston, WV 25301

Attorney General of the United States of America
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

s/ **Robert J. D'Anniballe, Jr.**
OF COUNSEL
