Geoffrey R. Kaiser, Esq. (GK-6991)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556-0926
Tel. (516) 357-3161

Attorney for [under seal]

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF NEW YORK

------------------------------------------------------x

UNITED STATES OF AMERICA *ex rel.*

[UNDER SEAL],

                     Plaintiff,

         vs.

[UNDER SEAL],

                    Defendant.

------------------------------------------------------x

Case No. CV 16 5741

DONNELLY, J.

COMPLAINT FOR VIOLATIONS OF FEDERAL CIVIL FALSE CLAIMS ACT
[31 U.S.C. §§ 3729 *et seq.*]

MANN. M.J.

**(FILED *IN CAMERA* AND UNDER SEAL)**

&RP8&D1&RPCourt Name: Eastern District of
New York
Division: 1
Receipt Number: 465310719S
Cashier ID: ssmith
Transaction Date: 10/14/2016
Payer Name: Rivkin Radler LLP
CIVIL FILING FEE
  For: Rivkin Radler LLP
  Case/Party: D-NYE-1-16-CV-005741-001
  Amount:    $400.00
PAPER CHECK CONVERSION
  Amt Tendered: $400.00
Total Due:       $400.00
Total Tendered:  $400.00
Change Amt:      $0.00

Geoffrey R. Kaiser, Esq. (GK-6991)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556-0926
Tel. (516) 357-3161


Attorney for [under seal]


# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF NEW YORK

------------------------------------------------x
                                  :

UNITED STATES OF AMERICA *ex rel.*    :   Case No. 16          5741

[UNDER SEAL],                  :                         DONNELLY,

                Plaintiff,  :  COMPLAINT   FOR VIOLATIONS OF
                          :  FEDERAL CIVIL FALSE CLAIMS ACT
                          :  [31 U.S.C. §§ 3729 *et seq.*]     MANN. M.J.
        vs.               :

[UNDER SEAL],                  :

                Defendant.  :  **(FILED *IN CAMERA* AND UNDER SEAL)**
                          :
------------------------------------------------x

&RP&D1&RPCourt Name: Eastern District of
New York
Division: 1
Receipt Number:: 4653107195
Cashier ID: ssmith
Transaction Date: 10/14/2016
Payer Name: Rivkin Radler LLP
CIVIL FILING FEE
  For: Rivkin Radler LLP
  Case/Party: D-NYE-1-16-CV-005741-001
  Amount:         $400.00

PAPER CHECK CONVERSION
  Amt Tendered: $400.00

Total Due:       $400.00
Total Tendered: $400.00
Change Amt:        $0.00

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x
:
UNITED STATES OF AMERICA *ex rel.*     :     Case No. _____
ELLYN D. WARD,                         :
                                       :     COMPLAINT  FOR VIOLATIONS OF
               Plaintiffs,             :     FEDERAL CIVIL FALSE CLAIMS ACT
                                       :     [31 U.S.C. §§ 3729 *et seq.*]
        vs.                            :
                                       :
AMEDISYS, INC.,                        :     JURY TRIAL DEMANDED
                                       :
               Defendant.              :     **(FILED *IN CAMERA* AND UNDER SEAL)**
                                       :
-------------------------------------------------------x

        Plaintiff-Relator Ellyn D. Ward, through her attorneys of record, on behalf of the United

States of America, for her Complaint against Defendant Amedisys, Inc. ("Amedisys"), alleges

based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.     **NATURE OF THE ACTION**

        1.     This is an action to recover damages and civil penalties on behalf of the United

States of America arising from false and/or fraudulent statements, records, and claims made and

caused to be made by Defendant and/or its agents, employees and co-conspirators in violation of

the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

        2.     As detailed below, Amedisys knowingly engaged in a fraudulent course of

conduct that, on information and belief, began no later than in or about 2011 and has continued

through the present day, causing millions of dollars in losses to the Medicare and Medicaid

programs.  Specifically, Amedisys engaged in the following distinct, albeit complementary,

fraud schemes designed to enhance revenues paid by the government for hospice-related

services:

2

(a) Amedisys implemented a scheme to bill Medicare and Medicaid for hospice services without obtaining or disclosing its failure to obtain a valid Certification of Terminal Illness ("CTI"), which was an explicit and material condition of payment for hospice services;

(b) Amedisys implemented a scheme to pay unlawful financial incentives to managerial employees, Account Executives and Transitions Coordinators in order to induce patient referrals for hospice services in violation of the federal Anti-Kickback Statute, and then billed Medicare and Medicaid for items and services arising from those illegal patient referrals;

(c) Amedisys implemented a scheme to admit and bill for patients at a General Inpatient ("GIP") Level of Care ("LOC"), the second most expensive LOC for hospice patients, when those patients did not exhibit systems justifying a GIP LOC; and

(d) Amedisys implemented a scheme to re-certify hospice patients as terminally ill and eligible for hospice benefits after 180 days, and at 60-day intervals thereafter, who were not, in fact, terminally ill or eligible for hospice benefits and then billed Medicare and Medicaid for the hospice services provided.

3.    The fraudulent practices described above constituted "false and fraudulent" claims under the Federal Civil False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq*. Such claims cheated the government and unlawfully enriched the Defendant. Therefore, Plaintiff-Relator, Ellyn D. Ward seeks to recover all available damages, civil penalties, and other relief for violations alleged herein.

## II.    **PARTIES**

4.    Plaintiff-Relator Ellyn D. Ward ("Relator") resides in New Jersey. Relator has been employed by Amedisys from in or about May 2015 through the present. Relator was initially hired as a Clinical Manager ("CM") at an Amedisys-owned hospice located in

Hackensack, New Jersey ("Hackensack Center"). In that position, Relator's responsibilities included management of a hospice professional team and review of hospice referral information along with qualifying documentation received from the field. On a daily basis, Relator's CM responsibilities started with a team meeting that reviewed events for the previous 24 hours, the on-call hours, and the scheduled visits for the next 24 hours. Admission documents were then reviewed and processed along with any discharges that were live or the result of death. Relator was responsible for assessing the competency of team members and would assist the Hackensack Center Interdisciplinary Team with oversight functions, including review of staffing for hospice patients receiving a General Inpatient Level of Care and the reassessment of such patients every 12 hours. Relator's role afforded her first-hand knowledge of patient eligibility requirements for admission, compliance with requirements for certifications of terminal illness, discharge circumstances, satisfaction of recertification criteria for lengths of stay exceeding 180 days, and symptom and bed management for hospice patients receiving a General Inpatient Level of Care. In or about October 2015, after repeatedly raising compliance concerns with her supervisors related to such matters as the failure of Amedisys to satisfy eligibility criteria for General Inpatient Level of Care being provided to patients not having any need for symptom management, improper patient re-certifications that were encouraged by an Amedisys Vice President named Matthew Snowden, improper documentation practices involving the cloning of clinical documentation to support hospice eligibility and quantitatively and qualitatively inadequate hospice staffing, among other issues, Relator submitted a letter of resignation. When questioned by Snowden concerning the reason for her resignation, Relator responded that she believed her nursing license was at risk working under conditions of poor quality and compliance. Snowden nonetheless prevailed upon Relator to accept a per diem position as a

4

CM. Relator agreed on the condition that she would not be required to accept any clinical responsibilities aside from processing patient charts. In her new position, Relator's responsibilities have included reviewing admission charts and recertification orders, along with processing such orders. Relator's new role has afforded her first-hand knowledge of weaknesses in admission and recertification procedures at Amedisys, as well as direct access to information pertaining to patient referrals, certifications of terminal illness, levels of care and lengths of stay.

5.    Defendant Amedisys, Inc. is a publicly held for-profit corporation organized under the laws of Delaware and headquartered in Baton Rouge, Louisiana at 5959 S. Sherwood Forest Boulevard. Amedisys describes itself as a leading healthcare at home company that provides home health, hospice and personal care.  According to Amedisys, it has 408 care centers in 34 states and more than 16,000 employees.  On Long Island, Amedisys maintains home health care centers in Hicksville and Medford.  For the last three years, Medicare represented approximately 80% to 84% of Amedisys's net service revenue.

### III.    <u>JURISDICTION AND VENUE</u>

6.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.  Relator is the original source of the facts and information alleged in this Complaint.  Relator provided the information on which her allegations are based to the government before filing this action.

7.    This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a), because that section authorizes nationwide service of process and because the

Defendant has minimum contacts with the United States. Moreover, the Defendant can be found in this District and/or transacts business in this District.

8.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), because at all times relevant to this Complaint, Defendant regularly conducted substantial business within this District, maintained employees in this District and/or can otherwise be found and resides in this District.

## IV.    APPLICABLE LAW

### A.    The False Claims Act

9.    The FCA was originally enacted during the Civil War and was substantially amended in 1986. Congress enacted the 1986 amendments to enhance and modernize the government's tools for recovering losses sustained by frauds against it. The amendments were intended to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the government's behalf.

10.    The FCA prohibits knowingly presenting or causing to be presented to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). Additionally, it prohibits knowingly making or using a false or fraudulent record or statement "material to a false or fraudulent claim" paid or approved by the federal government, or "material to an obligation to pay" money to the government and further prohibits knowingly concealing and improperly avoiding or decreasing "an obligation to pay" money to the government. 31 U.S.C. § 3729(a)(1)(B), (G). Pursuant to 31 U.S.C. § 3729(a)(1)(B), a false or fraudulent statement or record that is made for the purpose of causing the government to pay a claim, even if the fraudulent statement or record is not proffered directly to the government, is

6

still actionable where there is some nexus between the statement or record and the payment of the claim. Furthermore, both affirmative misrepresentations and the omission of facts material to a governmental decision to pay can render a claim false under the FCA. The FCA also prohibits two or more parties from conspiring to violate any of the liability provisions of the statute. 31 U.S.C. § 3729(a)(1)(C).

11.     Any person who violates, or conspires to violate, the FCA is liable for a civil penalty of up to $11,000 per claim for claims made on or after September 29, 1999 (and up to $21,563 per claim for claims made after November 2, 2015), plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a).

12.     The FCA does not require direct contact between a Defendant and the government. By its terms, the FCA imposes liability on any person who presents or *causes* to be presented a false or fraudulent claim to the government (or false statement in support of a false or fraudulent claim). See 31 U.S.C. § 3729(a).

13.     To "cause" an FCA violation, it is not necessary that a Defendant's fraudulent conduct be the last in the series of events that results in financial loss to the government. As applied by the courts, the standard for "causation" under the FCA is whether the submission of a false or fraudulent claim was "reasonably foreseeable" from a Defendant's actions. Under this standard, a Defendant's fraudulent conduct can occur anywhere in the chain of events leading to financial loss by the government, and can be an indirect, as well as direct, cause of the loss. Moreover, the Defendant need not be the recipient or beneficiary of the false claim. All that is required is that the Defendant, by its fraudulent conduct, set in motion a series of events which results in a reasonably foreseeable loss to the government.

14.     The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

15.     The federal anti-kickback statute (42 U.S.C. § 1320a-7b(b)) prohibits the payment or solicitation of any form of remuneration (directly or indirectly, overly or covertly, in cash or in kind) in exchange for the referral or any item or service payable under a federal health care program, including Medicare and Medicaid. A "false claim" is defined by statute to include any claim incorporating items or services resulting from a violation of the anti-kickback statute:

> (g) In addition to the penalties provided for in this section [i.e., 42 U.S.C. § 1320a-7b] . . . a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [31 U.S.C. §§ 3729 et seq.]

16.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the Defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

17.     The New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.*, is modeled after the FCA, and its liability provisions are virtually identical. Similarly to the FCA, any person who violates, or conspires to violate, the New York False Claims Act is liable for three times the amount of the damages sustained by New York State. In addition, a violator faces a civil penalty of up to $12,000 per claim.

8

B.   **The Federal Health Care Programs**

18.     The health care programs described in the paragraphs below, and any other government-funded healthcare programs, shall be referred to as "Federal Health Care Programs."

19.     The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare") is a health insurance program administered by the United States that is funded by taxpayer revenue.  Entitlement to Medicare is based on age, disability or affliction with certain diseases.  The program is overseen by the United States Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS").  Medicare provides for payment of hospital services, medical services, durable medical equipment and prescription drugs on behalf of Medicare-eligible beneficiaries.

20.     Claims submitted to Medicare for payment, whether submitted on a paper UB-04 (CMS-1450) Claim Form, or electronically, carry certifications of truth and accuracy.  The paper Claim Form carries a certification that the billing information on the form is true, accurate and complete, and that the provider submitting the form did not knowingly or recklessly disregard or misrepresent or conceal material facts. UBS-04 CMS-1450 Form.  The Claim Form further states that the person or entity submitting the form "understands that misrepresentation or falsification of essential information as requested" by the form "may serve as the basis for civil monetary penalties and assessments and may upon conviction include fines and/or imprisonment . . . ." *Id.* Those who submit claims electronically are likewise required to certify that the claims are "accurate, complete and truthful" and to "acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim . . . may, upon conviction, be subject to a fine

9

and/or imprisonment under applicable Federal law." Medicare Claims Processing Manual, Chapter 24, 30.2.

21.     The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("Medicaid") is a health insurance program administered by the United States and individual states and is funded by federal, state and local taxpayer revenue.   The Medicaid Program is overseen by HHS through CMS.  Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needy individuals that qualify for Medicaid.  The Medicaid program pays for services pursuant to plans developed by the States and approved by HHS through CMS.  42 U.S.C. §§ 1396a(a)-(b).   States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan." See 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as Federal Financial Participation.

22.     New York maintains a federally-approved Medicaid program to reimburse health care charges made by physicians and other health care providers for the treatment of many low-income New York citizens not covered by Medicare or private insurance.  Claims submitted to the New York Medicaid Program cause payments to be made by both the United States and New York State.  The United States and New York State contribute approximately half the cost of each claim submitted to the New York Medicaid Program.  Providers apply to participate in the New York Medicaid Program and agree as a condition of both participation and payment to comply with all the policies and procedures of the New York Department of Health ("DOH"), which administers the Medicaid Program in New York State.  All claims submitted to the

10

Medicaid Program, whether on paper or electronically, carry a Claim Certification Statement that certifies the provider's agreement to these conditions. The Certification Statement further states that all information included on the claim form is "true, accurate and complete" and that "no material fact has been omitted." New York State Medicaid Program, Information for All Providers, General Billing, p. 6; eMedNY/Medicaid Management Information System, Certification Statement for Provider Billing Medicaid. In addition, the Certification Statement includes an acknowledgement that "payment and satisfaction of this claim will be from federal, state and local public funds and that I may be prosecuted under applicable federal and state laws for any false claims, statements or documents or concealment of a material fact." _Id._

23.     DOH policies and procedures include an explicit exclusion from Medicaid coverage for medical care and services that are "fraudulently claimed" or "represent abuse or overuse," and define as an "unacceptable practice" when a provider "knowingly [makes] a claim for an improper amount or for unfurnished, inappropriate or excessive care, services or supplies." DOH also defines Medicaid fraud to include a provider who "submits false information for the purpose of obtaining greater compensation than that to which he/she is legally entitled." New York State Medicaid Program, Information for All Providers, General Policy, pp. 22-25. DOH further reserves the right to recover any overpayments, including "any amount not authorized to be paid under the Medicaid Program, whether paid as the result of inaccurate or improper cost reporting, improper claiming, unacceptable practices, fraud, abuse or mistake." _Id._

**C.     Hospice Benefits Under Medicare and Medicaid**

24.     Hospice care is an elected benefit under Medicare Part A for qualifying individuals. To be eligible for the hospice benefit under Medicare, an individual must be certified as having a terminal illness with a medical prognosis of 6 months or less if the illness

11

runs its normal course.  In addition, the individual must receive care from a Medicare-approved hospice program and must sign a statement indicating that he or she is electing the hospice benefit and waiving all other rights to Medicare payment for services related to the treatment of the individual's terminal illness and related conditions ("terminal illness").  Medicare will continue to pay, however, for covered services unrelated to the individual's terminal illness.

25.     The Medicare hospice benefit includes coverage for the following:

- Physician services furnished by Hospice-employed physicians and nurse practitioners (NP) or by other physicians under arrangement with the hospice provider;
- Nursing care;
- Medical equipment;
- Medical supplies;
- Drugs for pain and symptom management;
- Hospice aide and homemaker services;
- Physical therapy;
- Occupational therapy;
- Speech-language pathology services;
- Social worker services;
- Dietary counseling;
- Spiritual counseling;
- Grief and loss counseling for the individual and his or her family before and after death;
- Short-term inpatient care for pain control and symptom management and for respite care; and
- Any other Hospice services, as specified in the patient's plan of care (POC) and furnished or arranged by the hospice provider, as reasonable and necessary, and for which payment may otherwise be made under Medicare.

26.   Medicare will not pay for the following services when the hospice benefit is chosen:

- Hospice care furnished by a Hospice other than the Hospice designated by the individual (unless furnished under arrangement by the designated Hospice);
- Any Medicare services that are related to treatment of the terminal prognosis for which Hospice care was elected or that are equivalent to Hospice care, with the exception of the following:
  o   Care furnished by the designated Hospice;

12

> o  Care furnished by another Hospice under arrangements made by the designated Hospice; or
> o  Care furnished by the individual's attending physician who is not an employee of the designated Hospice or receiving compensation from the Hospice under arrangement for those services;
> • Room and board, unless it is for short-term inpatient care that the hospice provider arranges; and
> • Covered care in an emergency room, hospital, or other inpatient facility; outpatient services; or ambulance transportation, unless these services are either arranged by the hospice provider or are unrelated to the terminal prognosis.

27.    Hospice care is available for two periods of 90 days and an unlimited number of subsequent 60-day periods.  Medicare pays hospices a daily rate for each day a patient is enrolled in the hospice benefit.  Daily payments are made regardless of the amount of services furnished on a given day.  The payments are intended to cover the costs incurred by the hospice provider in furnishing services identified in the patient's POC, including services provided directly or arranged by the hospice provider.  Payments are made based on the level of care required to meet patient and family needs. The levels of care are: (1) Routine home care; (2) Continuous home care; (3) Inpatient respite care; and (4) General inpatient care.  2016 Medicare hospice payment rates before wage adjustment for hospices that reported quality data appear in the chart below:

**FY 2016 Hospice Payment Rates for Routine Home Care**

| Code | Description | FY 2016 Payment Rate | Labor Share | Non-Labor Share |
|---|---|---|---|---|
| 651 | Routine Home Care (days 1-60) | $186.84 | $128.38 | $58.46 |
| 651 | Routine Home Care (days 61+) | $146.83 | $100.89 | $45.94 |

**Source:** Centers for Medicare & Medicaid Services, MLN Matters® Number: MM9301 (Related Change Request (CR) #: CR 9301 Related CR Release Date: September 4, 2015 Effective Date: October 1, 2015 Related CR Transmittal #: R3345CP Implementation Date: October 5, 2015).

13

**FY 2016 Hospice Payment Rates for Continuous Home Care, Inpatient Respite Care, and General Inpatient (GIP) Care**

| Code | Description | FY 2016 Payment Rate | Labor Share | Non-Labor Share |
|---|---|---|---|---|
| 652 | Continuous Home Care Full Rate= 24 hours of care $=39.37 hourly rate | $944.79 | $649.17 | $295.62 |
| 655 | Inpatient Respite Care | $167.45 | $90.64 | $76.81 |
| 656 | General Inpatient Care | $720.11 | $460.94 | $259.17 |

**Source:** Centers for Medicare & Medicaid Services, MLN Matters® Number: MM9301 (Related Change Request (CR) #: CR 9301 Related CR Release Date: September 4, 2015 Effective Date: October 1, 2015 Related CR Transmittal #: R3345CP Implementation Date: October 5, 2015).

28.    The Medicaid Program also provides a hospice benefit.  To be eligible for hospice care under Medicaid, the individual's physician and the hospice medical director or designee must certify the individual as having a terminal illness.  The New York Medicaid Program currently defines a terminal illness as a medical prognosis for a life expectancy of twelve months or less if the illness runs its normal course.  Individuals choosing hospice care agree to forego other Medicaid or Medicare services for terminal illness.

29.    The Medicaid hospice benefit covers the following services:

- Nursing;
- Physician;
- Physical Therapy;
- Occupational Therapy;
- Speech and Language Pathology;
- Medical Supplies and Equipment;
- Home Health Aide and Homemaker;
- Bereavement;
- Pastoral Care;
- Pharmaceutical/Laboratory;
- Social Work;
- Nutrition;

14

- Psychological;
- Audiology; and
- Respiratory Therapy.

These services may be provided in the home, a nursing home, assisted living facility, free standing hospice, hospital or hospice residence.  The services must be provided according to a written plan of care and be focused on easing the symptoms of the terminal illness rather than curing the disease.

30.   Medicaid does not cover the following services in combination with the hospice benefit:

- Private Duty Nursing;
- Long Term Home Health Care Program/Lombardi Program;
- Certified Home Health Agency Services; and
- Adult Day Health Care service.

31.   Medicaid reimburses for hospice care as follows:

- For routine home care using an all-inclusive daily reimbursement rate;
- Continuous home care during periods of crisis;
- General inpatient care for pain or symptom management;
- Inpatient respite to relieve caregivers; and
- Room and board for individuals receiving hospice care in a skilled nursing facility or hospice residence.

32.     Medicaid hospice payment rates before wage adjustment for hospices that reported quality data in 2013 appear in the chart below:

**FY 2016 Medicaid Hospice Rates for Routine Home Care**

| DESCRIPTION | DAILY RATE | WAGE COMPONENT SUBJECT TO INDEX | NON-WEIGHTED AMOUNT |
|---|---|---|---|
| Routine Home Care (days 1-60) | $187.08 | $128.54 | $58.54 |
| Routine Home Care (days 61+) | $147.02 | $101.02 | $46.00 |

15

**Source:** Centers for Medicare & Medicaid Services, Financial Management Group, Memorandum to Associate Regional Administrators, "Annual Change in Medicaid Hospice Payment Rates," dated September 1, 2015.

**FY 2016 Medicaid Hospice Rates for Continuous Home Care, Inpatient Respite Care, General Inpatient (GIP) Care**

| DESCRIPTION | DAILY RATE | WAGE COMPONENT SUBJECT TO INDEX | NON-WEIGHTED AMOUNT |
|---|---|---|---|
| Continuous Home Care | $945.16 Full Rate = 24 hrs of care / $39.38 hourly rate | $649.42 | $295.74 |
| Inpatient Respite Care | $176.26 | $95.41 | $80.85 |
| General Inpatient Care | $720.11 | $460.94 | $259.17 |

**Source:** Centers for Medicare & Medicaid Services, Financial Management Group, Memorandum to Associate Regional Administrators, "Annual Change in Medicaid Hospice Payment Rates," dated September 1, 2015.

## V.    FACTS UNDERLYING THE FRAUD SCHEMES

### A.    The Fraudulent Scheme to Bill for Hospice Services Without Satisfying Regulatory Requirements for a Certification of Terminal Illness

33.    It is a statutory requirement that no Medicare payments for hospice care may be made unless:

> [I]n the first 90-day period . . . the patient's attending physician . . . and . . .the medical director . . . or physician member of the interdisciplinary group . . . of the hospice program providing (or arranging for) the care, *each certify in writing at the beginning of the period*, that the individual is terminally ill . . . based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness.

42 U.S.C. § 1395f(a)(7)(A)(i)(I), (II) – "Conditions of and Limitations on Payment for Services." (emphasis added).   "Terminally ill" under the statute means that "the individual has a medical prognosis that that individual's life expectancy is 6 months or less." 42 U.S.C. § 1395x(dd)(3)(A).

16

34.    Implementing regulations similarly state unequivocally that "the hospice must obtain the written certification before it submits a claim for payment." 42 C.F.R. § 418.22(a)(2).  "If the hospice cannot obtain the written certification within 2 calendar days . . . after a period begins," then the hospice "must obtain an oral certification within 2 calendar days and the written certification before it submits a claim for payment." *Id.* at § 418.22(a)(3)(i).

35.    The implementing regulations, consistent with the statutory language, make clear that the sources of the certification (whether written or oral) for the initial 90-day period must include ***both*** "**(i)** The medical director of the hospice or the physician member of the hospice interdisciplinary group; and **(ii)** The individual's attending physician, if the individual has an attending physician." *Id.* at § 418.22(c)(1)(i).  "Attending physician" for this purpose is defined as the physician who the patient "identifies as having the most significant role in the determination and delivery of medical care to the individual *at the time the individual makes an election to receive hospice care*." 42 U.S.C. § 1395x(dd)(3)(B) (emphasis added).  For subsequent periods of hospice care, only one of the enumerated physicians is required to certify at the beginning of the period. 42 U.S.C. § 1395f(a)(7)(A)(ii); 42 C.F.R. § 418.22(c)(2).  Furthermore, "[a]ll certifications and recertifications must be signed and dated by the physician(s), and must include the benefit period dates to which the certification or recertification applies." 42 C.F.R. § 418.22(b)(5).  Regulations require that the certifying physician "include a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms." 42 C.F.R. § 418.22(b)(3).  The narrative must "reflect the patient's individual clinical circumstances and cannot contain check boxes or standard language used for all patients" and the physician must

17

include a statement confirming that the narrative was "based on his/her review of the patient's

medical record or, if applicable, his/her examination of the patient." 42 C.F.R.

§ 418.22(b)(3)(iii), (iv).

36.   The rules governing the Medicaid program are similar:

> The hospice must obtain the certification that an individual is terminally ill in accordance with the following procedures:

> For the first period of hospice coverage, the hospice must obtain, no later than two calendar days after hospice care is initiated, written certification statements signed by the medical director of the hospice or the physician member of the hospice interdisciplinary group and the individual's attending physician (if the individual has an attending physician).

> ***If the hospice does not obtain a written certification within two days after the initiation of hospice care, a verbal certification may be obtained within these 2 days, and a written certification obtained no later than 8 days after care is initiated.  If these requirements are not met, no payment can be made for days prior to the certification.***

State Medicaid Manual, 10-90, 4305.1, Hospice Services (Emphasis added).  For subsequent

periods of hospice coverage, "the hospice must obtain, no later than two calendar days after the

beginning of that period, a written certification statement prepared by the medical director of the

hospice or the physician member of the hospice's interdisciplinary group. . . ." *Id.*  "Terminally

ill" under Medicaid means that "the patient has been diagnosed with a medical condition that

reduces their life expectancy and is near the end of life." *Hospice Toolkit, An Overview of the*

*Medicaid Hospice Benefit,* at p.3, Centers for Medicare & Medicaid Services (Feb. 2016).  The

precise life expectancy used to trigger terminally ill status, however, will vary with each State's

Medicaid program, with some States using a life expectancy of 6 months or less and others, like

New York, using a life expectancy of 12 months or less. *Id.* at p.3 nn. 1, 2, 4.

37.  On information and belief, Amedisys knowingly and routinely billed Medicare

and Medicaid for hospice services without first obtaining a Certification of Terminal Illness

("CTI") meeting the regulatory requirements described above. Moreover, although the facts being alleged herein concern Amedisys activities related to the Hackensack Center, on information and belief, based on conversations between Relator and Amedisys executives having regional responsibilities, the same type of misconduct is occurring at other Amedisys locations around the country.

38.    Relator has reviewed a report maintained by Amedisys called "CTI Non- Compliant Report" ("CTI Report"), relating to the Hackensack Center and covering dates of service from February 1, 2016 through July 18, 2016. The CTI Report, which Relator retrieved from the Hackensack Center's "Home Care Home Base" database, lists patients for whom Amedisys had not yet obtained a valid CTI. Relator compared the CTI Report to another report retrieved from the same system named "Perform Billing Audit Per Diem" ("Billing Hold Report") that encompassed the same period. The Billing Hold Report lists patients for whom Amedisys was not yet submitting bills to payers, including Medicare and Medicaid, for various reasons. Relator discovered that approximately 261 of the patients listed on the CTI Report as not having valid CTIs were *not* listed on the Billing Hold Report covering the same time period, indicating that Amedisys likely was billing for those patients anyway.

39.    The CTIs completed by Amedisys had assorted defects. For example, approximately 44 out of 477 patients listed on the CTI Report had a CTI signed only by the Medical Director of the Hackensack Center, Richard Rosenbluth, M.D., as the sole certifying physician, despite the fact that 35 of the 44 patients had another physician providing care at the time the patient elected to receive hospice care who would have qualified as an "Attending Physician" required by law to sign the certification. Relator had addressed this particular problem on a prior occasion with the Director of the Hackensack Center, Lisa Modirian. However, Modirian stubbornly (and

19

erroneously) insisted that a second signature was not required if the Attending Physician did not continue to care for the patient in the hospice. Relator has determined that approximately 30 of the 44 patients referenced above did not appear on the Billing Hold Report, indicating that Amedisys likely submitted bills for those patients.

40.    Relator further discovered that approximately 239 of the patients on the CTI Report had at least one CTI signed *after their deaths*. In all, Relator found that for the patients listed on the CTI Report, approximately 383 CTIs (including CTIs for the initial 90-day period of care and additional CTIs for subsequent periods of care) were signed *after the patients had died*. As noted, Medicare explicitly requires that the CTI be obtained "at the beginning of the period" of care. 42 U.S.C. § 1395f(a)(7)(A)(i). Likewise, Medicaid requires that the CTI be obtained "no later than 8 days after care is initiated." State Medicaid Manual, 10-90, 4305.1. Waiting until after the patient is dead to obtain the required CTI is obviously too late. Relator discovered that approximately 150 patients not listed on the Billing Hold Report had CTIs signed by the Medical Director of Hackensack Center or their Attending Physician, or both, *after the patients' deaths*, indicating that Amedisys billed Medicare and Medicaid despite these fatal deficiencies in the CTIs.

41.    In 2015, the Hackensack Center did not utilize the "Home Care Home Base" database system. Instead, it employed a different system known as "AMS." Relator has randomly reviewed approximately 132 charts from the AMS system for 2015 and found the following: (a) approximately 21 CTIs were signed after the patients' deaths; (b) approximately 5 CTIs were signed by a physician but were undated; and (c) approximately 3 CTIs were missing a signature from either a qualifying hospice representative (*i.e.,* either the hospice medical director or a physician from the hospice interdisciplinary group) or the patient's attending physician. On

20

information and belief, based upon Relator's review of the 2016 CTI Report and Billing Hold

Report indicating that Amedisys billed for hospice patients in the absence of a valid CTI, Relator

believes it is also likely that Amedisys billed for the patients associated with the defective 2015

CTIs described in this paragraph.

### Representative Patient Examples

42.    Patient A, a male Medicare patient, was admitted to hospice care at Hackensack

Center in 2016. The CTI purports to contain a verbal certification of terminal illness, but the

form lacks any actual evidence of a verbal certification and the date given for the verbal order is

almost two weeks after the period of care began, in violation of regulatory requirements. The

CTI also contains no narrative describing the basis for certifying the patient as terminally ill,

which is a regulatory requirement. Patient A, moreover, does not appear on the Billing Hold

Report, indicating that Amedisys billed Medicare for this patient in violation of regulations

barring payment of hospice benefits in the absence of a valid CTI.

43.    Patient B, a male Medicare patient, was admitted to hospice care at Hackensack

Center in 2016 with a primary diagnosis of End Stage Chronic Obstructive Pulmonary Disease

("COPD") and a history of emphysema, bronchitis, asthma, diabetes and congestive heart failure.

He was admitted to Routine LOC in his home. Patient B died three days later, but a certification

of terminal illness was not signed until after his death. There are CTI forms purporting to

evidence verbal certifications of terminal illness from the patient's attending physician and the

hospice medical director. Electronic signature dates for the certifications appearing on the

forms, however, are after Patient B's death. In addition, the Hospice Certification and Plan of

Care includes signed certification statements that also are dated after Patient B's death. Thus, a

valid CTI was never obtained at "the beginning of the period" of care as the law requires.

21

Patient B does not appear on the Billing Hold Report, indicating that Amedisys billed Medicare for this patient in the absence of a valid CTI.

44.    Patient C, a female Medicare patient, was admitted to hospice care at Hackensack Center in 2016 with a primary diagnosis of colon cancer. She was admitted to Routine LOC in her son's home. Patient C died six days after admission. There is a CTI form purporting to evidence a verbal certification of terminal illness from the patient's attending physician. There is no similar form for the hospice medical director, as regulations specifically require. The certification statement on the form reflects an electronic signature of the attending physician that is dated four months after the patient's death. There is no electronically signed certification statement from the hospice medical director, as regulations specifically require. Thus, a valid CTI was never obtained at "the beginning of the period" of care as the law requires. Patient C does not appear on the Billing Hold Report, indicating that Amedisys billed Medicare for this patient in the absence of a valid CTI.

45.    Patient D, a male Medicare patient, was admitted to hospice care at Hackensack Center in 2016 with a primary diagnosis of malignant neoplasm of the larynx. He was admitted to GIP LOC, which he received until his death. The hospice medical director did not sign or date any page of the Hospice Certification and Plan of Care document, including the certification of terminal illness statement on the first page. There is a two-page CTI form purporting to evidence a verbal certification of terminal illness obtained at the time of admission. That CTI, which purports to support a "readmission," reflects a "face-to-face" encounter with a nurse practitioner the following day. The medical director's certification statement at the bottom of each page, however, is not signed or dated. Instead, there is a separate "Attestation" appearing above the certification statement on page two, which refers to a non-existent "narrative" and which is dated

22

five days after Patient D died. Thus, a valid CTI was never obtained at "the beginning of the period" of care as the law requires. Patient D does not appear on the Billing Hold Report, indicating that Amedisys billed Medicare for this patient in the absence of a valid CTI.

46.     Patient E, a male Medicare patient, was admitted to hospice care at Hackensack Center in 2016 with assorted diagnoses of vascular dementia, Alzheimer's Disease, acute renal failure and acute respiratory distress. He was admitted to GIP LOC, and remained in that classification until his death. The CTI form for this patient was created and signed by the hospice medical director and the attending physician weeks after Patient E died. There is no verbal certification in the patient's file. The Hospice Certification and Plan of Care document is also signed and dated by both physicians after Patient E's death. Thus, a valid CTI was never obtained at "the beginning of the period" of care as the law requires. Patient E does not appear on the Billing Hold Report, indicating that Amedisys billed Medicare for this patient in the absence of a valid CTI.

### B.   The Fraudulent Scheme to Pay for Hospice Patient Referrals in Violation of the Anti-Kickback Statute

47.     Amedisys implemented a scheme to pay unlawful financial incentives to employees in order to induce patient referrals for hospice services in violation of the Anti-Kickback Statute, and then billed Medicare and Medicaid for items and services arising from those illegal patient referrals. On information and belief, this incentive structure was implemented nationally.

48.     During Relator's employment interview at Amedisys, she was informed by Matthew Snowden, Area Vice President for Operations - Hospice North New Jersey, Connecticut and Rhode Island, that Amedisys implemented a quarterly bonus structure for CMs that rewarded a CM's contributions to the patient census through patient referrals and

23

recertifications.   Snowden advised Relator that it was the expectation at Amedisys that the bonuses would be achieved, which would raise Relator's base salary of $105,000 to a total compensation amount of between $132,000 and $135,000 annually.   Relator never received written confirmation of the bonus policy discussed by Snowden during her job interview.

49.   On or about December 2015, Relator spoke to a friend named Denise Wegel RN, who was an Amedisys Business Development interviewee, concerning her compensation package at the time she was offered a position of Care Transition Coordinator.   Wegel advised Relator that she was offered an annual salary of $80,000 plus a bonus.   Wegel explained that the first 10 patient referrals in a month were not eligible for a bonus, but after that threshold was reached, Amedisys paid $100 per patient referral.   The following is an excerpt from a text exchange between Relator and Wegel that occurred on June 8, 2016, in which Wegel discusses the illicit bonus structure:

**Relator:**     Hello Ms. Denise! I was wondering if my company [*i.e.*, Amedisys] gave you an email or a written letter with the offer of your position before compassionate. Let me know what you think.

**Wegel:**     [N]o they did not . . . only verbal from [recruiter] . . . so unprofessional . . . [they] should have given me . . . the hospital . . . [I] know [I] would have loved that and done well there . . . [c'est] la vie mon ami . . . .

**Relator:**     Did they ever tell you about the compensation for referrals like the bonus according to number of referrals?

**Wegel:**     [Y]es they did . . . first ten nothing after that 100 for each [one] after ten . . . starting salary was in the low 80[s] . . . are you thinking of doing that? . . . [M]att and [K]yle told me about the bonus structure . . . .

**Relator:**     Kyle is gone - no I am not taking that. I am an advocate for salary (higher) and no bonus but I did not know how the bonus structure worked . . . .

24

50.   On or about June 10, 2016, Relator spoke to an Amedisys employee named Jonathan Campbell, who was an Account Executive for the company.  Campbell advised relator that his position pays a salary plus a bonus for referrals.  According to Campbell, the first 15 referrals per month were not eligible for a bonus as an Account Executive, but after that threshold was reached, Amedisys paid $100 per referral, with the bonus increasing to $200 per referral above a certain referral volume.  Campbell further advised Relator that, typically, a 600 bed hospital could yield between 30-40 referrals per month.

51.   As a consequence of this illicit bonus system, there was an enormous incentive for Amedisys staff to generate patient referrals and recertifications.  In addition, Snowden pressured staff to generate referrals and sought to influence patient discharge determinations in order to maintain patients on service and avoid a reduction in the patient census.

52.   The bonus program described above is a blatant violation of the Anti-Kickback Statute.  On information and belief, Amedisys submitted claims for hospice services arising from the referrals generated and paid for through this compensation structure.  All such claims were false claims under the FCA by operation of law and resulted in losses to Medicare and Medicaid, the precise amount of which are unknown at this time. *See* 42 U.S.C. § 1320a-7b(g) (any claim that includes items or services resulting from a violation of the Anti-Kickback Statute is automatically a false claim for purposes of the False Claims Act).

## C.   The Fraudulent Scheme to Falsely Qualify Patients and Bill for GIP LOC

53.   As noted above, the daily rates for GIP LOC are the second highest, after Continuous Home Care ("CHC") LOC.  Amedisys, as a matter of company policy, generally did not offer CHC LOC to its patients, notwithstanding that all Medicare-participating hospices are required to offer each level of care to qualifying hospice patients. *See* 42 U.S.C. § 1395x(dd)(1),

(2)(A)(i); 42 C.F.R. § 418.302(b)(2); Memorandum Report, Department of Health and Human Services, Office of Inspector General, *Medicare Hospice: Use of General Inpatient Care*, dated May 3, 2013, at p. 3; Medicare Benefit Policy Manual, Chapter 9-Coverage of Hospice Services Under Hospital Insurance, §§ 40, 40.2.1; CMS Manual System, Pub. 100-07, State Operations Provider Certification, State Operations Manual, "Guidance to Surveyors: Hospice" (requiring surveyors for initial hospice Medicare certification "verify that the hospice is fully prepared to provide all services necessary to meet the hospice [conditions of participation]") (October 1, 2010). This illicit practice alone should render all Amedisys Medicare claims non-reimbursable during its period of non-compliance. Amedisys's eligibility to participate in Medicare was contingent upon its willingness to provide CHC LOC to all patients who were eligible for such care. The company's decision to conceal its noncompliance with this basic legal requirement when submitting claims to Medicare constituted a material misrepresentation that would certainly have affected the government's decision to pay those claims.

54.   On information and belief, Amedisys elected not to provide CHC LOC to hospice patients in order to avoid the administrative costs associated with such care, which is extremely demanding and requires trained staff that Amedisys would have had to pay at an hourly rate. Specifically, CHC LOC is care that is provided to an individual who is not in an inpatient facility and who "receives hospice care consisting predominantly of nursing care on a continuous basis at home." 42 C.F.R. § 418.302(b)(2). By regulation, CHC LOC is only authorized to be "furnished during brief periods of crisis" and "only as necessary to maintain the terminally ill patient at home." 42 U.S.C. § 1395z(dd)(1); 42 C.F.R. §§ 418.302(b)(2), 418.204(a). Such care, however, is part of the Medicare hospice benefit and, as noted, must be made available to eligible patients by any Medicare-certified hospice.

55.   In addition to avoiding the costs associated with CHC LOC by generally failing to make that level of care available as required by law, Amedisys engaged in a pattern and practice of falsely qualifying patients who were only eligible to receive Routine Home Care ("RHC") LOC – the least expensive level of hospice care – for the more lucrative GIP LOC.  Moreover, although the facts being alleged herein concern Amedisys activities related to the Hackensack Center, on information and belief, based on conversations between Relator and Amedisys executives having regional responsibilities, the same type of misconduct is occurring at other Amedisys locations around the country.

56.   GIP LOC is when "a patient receives general inpatient care in an inpatient setting for pain control or acute or chronic symptom management which cannot be managed in other settings." 42 C.F.R. § 418.302(b)(4).  GIP LOC is intended as a short term intervention in order to manage acute symptoms that cannot be managed through other means in the patient's home or another residential setting. *See Managing General Inpatient Care for Symptom Management, Tips for Providers*, National Hospice and Palliative Care Organization, at p.2. The need for GIP LOC may arise after "a period of gradual decline, with a sudden change in symptoms or condition" or when CHC LOC has proven ineffective. *Id.* GIP LOC may also be required "at the end of an acute hospital stay if there is a need for pain control or symptom management" which cannot otherwise be provided in the home. *Id.* at pp. 2-3.  Examples of patient conditions that may require GIP LOC include: (1) "Pain or symptom crisis not managed by changes in treatment in the current setting or that requires frequent medication adjustments and monitoring"; (2) "Intractable nausea/vomiting"; (3) "Advanced open wounds requiring changes in treatment and close monitoring"; (4) "Unmanageable respiratory distress"; (4) "Delirium with behavior issues"; and (5) "Sudden decline necessitating intensive nursing intervention." *Id.* at p. 3.  GIP LOC is

*not* an appropriate level of care for a dying patient at the end of life unless there is a need for skilled nursing and pain or symptom management that cannot be managed in any other setting. *Id.*; *see also*  Medicare Benefit Policy Manual, Chapter 9 - Coverage of Hospice Services Under Hospital Insurance, 40.1.5 - Short-Term Inpatient Care.

57.    Unlike CHC LOC, for which Amedisys would be required to pay an hourly rate to a nurse and an aide working in the patient's home, for GIP LOC Amedisys paid only a daily rate to the institution (*e.g.,* a hospital or nursing home) at which the patient receiving such care was located.  Amedisys also could rely on the hospital or nursing home staff to render care to the patient while Amedisys staff only visited the patient periodically.  Amedisys, however, was able to bill the GIP LOC provided at a daily rate far above that reimbursed for RHC LOC.

58.    The patients who Amedisys falsely qualified for GIP LOC did not satisfy the criteria for such care because they lacked the types of acute symptoms described above.  In many cases, Amedisys would move terminally ill hospital patients who were near death and exhibiting only routine end-of-life symptoms (*e.g.*, labored breathing) not requiring acute symptom management to beds reserved for GIP LOC in order to bill Medicare and Medicaid at the higher rate.  This practice benefits the hospital because a patient death while in GIP LOC is attributed to Amedisys, and not the hospital.  As a regular practice, Amedisys staff went to all areas of Hackensack University Medical Center ("HUMC") in search of dying patients to admit to hospice care.  On information and belief, Amedisys hired more employees to "find" patients who could be admitted to hospice care, including GIP LOC, than staff needed to manage the patients once they are admitted.  Area Vice President Matthew Snowden once advised Relator that Amedisys staff were required to admit at least five hospice patients per day, and that GIP LOC beds must be a priority to be filled at all times.

28

59.     On or about July 28, 2016, Relator reviewed a report for the Hackensack Center named "Hospice Cost Report by Level of Care-Detail" ("LOC Report"). The LOC Report revealed that no CHC LOC had been billed for the period of the report; other reports reviewed by Relator revealed that Amedisys had only offered CHC LOC once between 2011 and 2015. The LOC Report also disclosed that approximately 114 hospice patients were billed at GIP LOC since February 1, 2016, of which only approximately 14 hospice patients were removed from GIP LOC prior to their deaths, indicating that the majority of the patients had been transferred to GIP LOC at HUMC because they were dying and not because they required acute symptom management at the end of their lives. The improper transfer of patients to GIP LOC also allowed the Amedisys business development staff to receive bonuses for the referrals while benefiting the hospital by reducing the number of recorded deaths attributable to the hospital.

### Representative Patient Examples

60.     Patient D, a male Medicare patient, was admitted to hospice care at Hackensack Center in 2016 with a primary diagnosis of malignant neoplasm of the larynx. He was admitted to the HUMC GIP LOC unit, where he stayed until his death. Patient D's stay at GIP LOC was not justified by his medical condition. This conclusion is evidenced by, among other things:

      a. The file for Patient D reflects periods in which his pain is not controlled, but there are no intensive medication interventions. There is no day in which the physician ordered more than one pain medication change in 24 hours. Amedisys staff documented a pain level of 8 out of 10, which should have had more intensive treatment management than reflected. The Vital Sign Trending Report records the patient's reported pain levels. Later the same month, the pain level was below 4 out of 10 and sometimes "0." Patient D was pain-free on certain days, but was

29

not transferred to Routine LOC, despite evidence in the file that such a transfer was discussed.

b.  Over the entire course of Patient D's ten day stay in the HUMC GIP LOC unit, there were only two medication changes indicated and two occasions requiring management of excessive oral secretions.

c.  Patient D's records contain cloned narrative notes from Amedisys nursing staff which raise serious questions concerning the reliability of records as a whole.  If notes are being cloned rather than recording individualized patient assessments, there is no valid evidence with which to assess the presence of acute symptoms requiring GIP LOC is frustrated. For one date, there are no narrative notes at all for this patient.

d.   As described in paragraph 45 above, Patient D's CTI documentation is also fatally defective in various ways, including that the CTI was not signed until after the patient's death.

In summary, on information and belief, Patient D spent 10 days on GIP LOC without having a need for acute symptom management that could justify for this level of care.  Even on days when the file documents pain, there is no indication that intensive interventions were required to control the pain, and there are days when Patient D had no pain symptoms noted at all.  This constituted a fraud on Medicare and a violation of the FCA.

61.   Patient E, a male Medicare patient, was admitted to hospice care at Hackensack Center on 2016 with differing diagnoses of vascular dementia, Alzheimer's Disease, acute renal failure and acute respiratory distress reflected on the CTI, Hospice Plan of Care and hospice interdisciplinary group ("IDG") forms in the patient's file. These conflicting medical

assessments of the reason for admission would not support any hospice admission, much less admission to GIP LOC, which requires evidence that acute symptom management is needed. Yet, Patient E was admitted to the Amedisys GIP LOC unit at Hackensack University Medical Center ("HUMC"), where he stayed until his death. Documentation in the patient's file reflects a pattern of "negative charting" in which negative assessments of Patient E to support GIP LOC are contradicted by facts reflecting the patient's actual condition. This conclusion is evidenced by, among other things:

   a. There are patient assessments in the file indicating that only low-intensity care needs were present and that hospice staff were providing only basic support and monitoring care. There is no documentation in the file reflecting the existence of frequent problems that needed to be managed intensively with GIP LOC.

   b. The visit notes reflect that this patient received only Routine LOC, yet he was classified for billing purposes as GIP LOC. Patient E frequently was assessed as having no pain during his hospice stay, and his respirations were fourteen per minute, a low rate not consistent with the "acute respiratory distress" characterization given to justify his admission.

   c. Documentation reflects that Patient E was comatose and non-responsive during his entire stay at GIP-LOC in the Hackensack University Medical Center. Thus, from the date of hospice admission through the date of death, Patient E was unable to indicate pain or shortness of breath or any other "acute symptom" that might require management and justify GIP-LOC. The file reflects that Patient E received medications that could have been administered at a Routine LOC.

31

d. An Amedisys staff member documented a pain level of 6 out of 10 on one date, but the notes do not identify how this assessment was made, or if medication was administered and, if so, when. Further, as noted above, other notes in the file document the patient as having no pain.

e. There were no new or intensively managed symptoms noted during his entire stay at Hackensack Center. On the day after admission, the file indicates that Patient E was relaxed, his face inexpressive and that he appeared to be "doing well" after receiving medication. Yet, for the same day, the file inconsistently purports to document a sporadic pain level of 5 while stating that the patient is non-responsive and had respirations of 12 per minute. These inconsistencies appear through Patient E's file during his stay at GIP LOC.

f. The medication notes for Patient E evidence a stable patient who required only small amounts of morphine on a daily basis. The medication record reveals 11 instances where the patient did not receive anxiety medication because he was "showing no pain, distress, or agitation."

g. The file is consistent in reflecting entries from nursing staff at HUMC describing Patient E as a stable and comfortable patient, as contrasted with Amedisys staff entries that attempt, albeit inconsistently, to portray a more emergent patient. This contrast reflects the "negative charting" that Amedisys employed to qualify Patient E for GIP LOC billing.

In summary, on information and belief, Patient E was billed at a GIP LOC rate for a ten-day period, when only Routine LOC was justified based on his actual condition and medical requirements. This constituted a fraud on Medicare and a violation of the FCA.

62.    Patient F, a male Medicare patient, was admitted to hospice care at Hackensack Center in 2016 with a primary diagnosis of bladder cancer with metastasis to the colon. Patient F was admitted to the Amedisys GIP-LOC unit at HUMC, where he stayed until his death. There is no evidence in the file to support GIP-LOC rather than Routine LOC. This conclusion is evidenced by, among other things:

    a.   The Hospice Certification and Plan of Care was signed by two Amedisys medical directors, but not Patient F's actual attending physician, who was listed on the hospice referral form. Moreover, one of the two medical director signatures was dated four days after the patient's death.

    b.   Patient F's symptoms did not justify GIP LOC. The hospice plan of care in the file reflects low intensity management of symptoms, indicating that Patient F would be qualified for Routine LOC. All vital signs for Patient F were within normal limits. His respiratory rates were all normal until the date of death, when his respirations predictably slowed in a manner consistent with dying, but not GIP LOC. Notes in the files reflect that Patient F's oxygen saturation level was well within normal limits with no evidence of "respiratory distress." Although "pain" is listed as a symptom qualifying Patient F for GIP LOC, the evidence in the file, including notes indicating the absence of medication changes despite pain level recordings, indicates that Amedisys staff were negatively charting Patient F to qualify him for GIP LOC.

    c.   Patient F was admitted to the HUMC GIP LOC unit on the same day the patient stated that he "wants to die at home," where he would have been on Routine LOC. The file documents Patient F's repeated requests to be discharged to his

home, with notations that the patient was "anxious to go home" and "demanding
to go home," along with other notations indicating that the patient's symptoms
were "under control" and that he had "no pain."

In summary, on information and belief, Patient F's file reflects that his condition could have
been managed at home on Routine LOC and that he lacked symptoms requiring GIP LOC. This
patient's care was not individualized and Amedisys ignored without justification his wish to be
discharged to his home to die. This was not only an affront to Patient F's rights and dignity, but
it was also a fraud on Medicare and a violation of the FCA.

### D.  The Fraudulent Scheme to Falsely Recertify Hospice
### Patients as Eligible for Hospice Benefits After 180 days

63.    Amedisys implemented a scheme to re-certify hospice patients as terminally
ill and eligible for hospice benefits after 180 days, and at 60-day intervals thereafter, who were
not, in fact, terminally ill or eligible for hospice benefits and then billed Medicare and Medicaid,
among other payers, for the hospice services provided. Moreover, although the facts being
alleged herein concern Amedisys activities related to the Hackensack Center, on information and
belief, based on conversations between Relator and Amedisys executives having regional
responsibilities, the same type of misconduct is occurring at other Amedisys locations around the
country.

64.    Relator has reviewed internal reports containing census information revealing that
a significant percentage of hospice patients at the Hackensack Center had a length of stay
exceeding 180 days (*i.e.,* six months) between the years of 2011-2015. Area Vice President
Matthew Snowden and other senior Amedisys executives pressured employees to generate
patient admissions and re-certifications in order to maintain a high daily census level so that
revenue to the company would be maximized and those executives, along with Business

Development Staff, could continue to receive bonuses quarterly based on the number of patient admissions. Snowden repeatedly spoke to staff about "finding" information to recertify patients with the goal of achieving certain patient census goals. The actual eligibility of those patients to receive such care was of secondary importance.

65.     In order to maximize the number of re-certifications, Amedisys leadership encouraged negative patient charting by making suggestions on how to document hospice re-certifications, including recommending changes to the primary diagnosis if that would make it easier to re-certify a patient. Hackensack Center reports demonstrating a high rate of live patient discharges after 180 days support the conclusion that Amedisys was improperly re-certifying patients for hospice care after their initial period of care had run its course.

66.     Moreover, there is a regulatory requirement as part of the certification process that "a hospice physician or hospice nurse practitioner must have a face-to-face encounter with each hospice patient whose total stay across all hospices is anticipated to reach the 3rd benefit period [*i.e.,* more than 180 days]." 42 C.F.R. § 418.22(a)(4). "The face-to-face encounter must occur prior to, but no more than 30 calendar days prior to, the 3rd benefit period recertification, and every benefit period recertification thereafter, to gather clinical findings to determine continued eligibility for hospice care." *Id.* Regulations specifically require that the certification contain "a brief narrative explanation of the clinical findings" and that "[t]he narrative associated with the 3rd benefit period recertification and every subsequent recertification must include an explanation of why the clinical findings of the face-to-face encounter support a life expectancy of 6 months or less." *Id.* at § 418.22(b)(3)(v). Relator's review of narrative reports for hospice patients at the Hackensack Center who had reached their third benefit period revealed that the reports were frequently deficient and did not support a finding of terminal illness.

## Representative Patient Examples

67.    Patient G, a Medicare patient, is an elderly female who was admitted to the Hackensack Center in 2014 and remains on hospice care as of the date of this filing, which is more than 780 days. She was admitted to service with a primary diagnosis of End Stage Alzheimer's disease late onset.  She was admitted as, and remains, a chronically ill rather than terminally ill patient, and her care has been custodial in nature since her admission. This conclusion is evidenced by, among other things:

    a.  Rare medication changes for symptoms that do not indicate the patient is terminally ill or in need of end-of-life case management. The patient, who is over 90 years old, has occasional lower back pain which is relieved with Tylenol.  Back pain is not unusual in a patient of this advanced age, and certainly does not evidence terminal illness.

    b.  The Vital Signs Trending Report reflects vital signs within normal limits.

    c.  The Hospice Plan of Care for this patient contains minimal evidence of medical interventions over the course of multiple recertification periods.  Where the Hospice Plan of Care describes medical interventions, it does so in a repetitively worded and non-individualized manner reflecting chronic, but not terminal illness.

    d.  There are copies of CTIs for this patient that are incomplete, lack a narrative or other evidence of hospice eligibility, and contain no data to support even a routine level of care under the hospice benefit.  Further, the CTI for one of the benefit periods relating to this patient is not in the file.

    e.  Face-to-face encounter forms completed for this patient do not reflect any evidence of terminal illness or any basis for Amedisys's recertification of this patient for each

benefit period after 180 days on hospice service.  All of the documented visits are generic and lack any evidence of terminal illness or diagnosis. There is no supporting data to prove that this patient is terminally, as opposed to chronically, ill. Further, two face-to-face encounter forms required by regulation for certification periods in 2015 and 2016 could not be found in the file.

In summary, on information and belief, Amedisys has been providing custodial care for a chronically ill 102-year-old female, but billing Medicare for hospice care that this patient was never eligible to receive.  As noted, this patient has been on service with Amedisys for more than 780 days and has been recertified repeatedly with no actual evidence of terminal illness.  On information and belief, Amedisys has now fraudulently billed Medicare an estimated $140,760 for this patient under the hospice benefit.

68.    Patient H, a Medicare patient, is an elderly female who was admitted to Amedisys hospice care in 2013 in a skilled nursing facility ("SNF") in New Milford, NJ.  She was admitted with a diagnosis of "Late Effect of Cerebrovascular Disease," but in a physical condition that was chronically ill, not terminally ill.  Her admission assessment did not fit the criteria for hospice care, as she did not present as terminally ill, and was already receiving custodial care in the SNF. When Relator recommended to Amedisys Director Susan Viapiano, RN that Patient H be discharged, Area Vice President Matthew Snowden recommended that the patient's diagnosis be reconsidered because, on information and belief, he did not want to lose Patient H from the hospice census statistics.

69.    Eventually, in 2015, the Hackensack Center IDG was directed to change the diagnosis of Patient H to Alzheimer's Disease.  Patient H had experienced a previous Cerebrovascular Accident (CVA) and both CVA and Alzheimer's Disease involve similar

37

assessments, including weight loss, assistance with food intake, frequent sleeping, little or no

vocalization, dependence in daily living activities, and non-ambulatory. These conditions were

reflected in every hospice care recertification, but they were chronic conditions for this patient,

not terminal conditions. Notwithstanding this fact, Amedisys sought to chart these conditions as

terminal in each recertification until Patient H was finally "discharged live" in 2016. Patient H

never fit the criteria for hospice care, but spent 1016 days on hospice service, totaling 16 benefit

periods paid for by Medicare. Some of the evidence supporting the conclusion that Patient H did

not qualify for hospice care includes:

a. Medication changes are not evident on the Client Medication Report or on the

Hospice Plan of Care in all benefit periods. Medications changes would occur if there

was a terminal condition that required medication changes for symptom management

as the condition worsened. For the certification period starting December 15, 2014,

the only new medication in four certification periods is Zinc Oxide topical ointment.

b. Vital Sign Trending Report reveals some vital signs are within normal limits. The

report also reflects that information is not being gathered to prove Patient H is

terminally ill, such as Body Mass Index ("BMI"), Functional Assessment, oxygen

saturation levels, pain, and measurements showing no weight gain.

c. The Hospice Plan of Care reveals that interventions and goals are copied from one

benefit period to the next, without any evidence of individualized assessments or

documentation that goals are being reached.

d. While hospice personnel document "weight loss" as a basis for recertification, they

are simultaneously (and contradictorily) identifying Patient H for a nursing

intervention on the Hospice Plan of Care to "teach normal process of decreasing

intake as physical conditions deteriorate." Also of concern, while Patient H is documented as having a decreased appetite, her condition did not actually deteriorate (since she was "discharged live"), raising the disturbing possibility that her food intake was inappropriately lowered during her stay by hospice staff.

e.  Face-to-face encounter forms for this patient are not individualized and lack any evidence of terminal illness to support recertification for all benefit periods after 180 days. They include generic statements such as "significant weight loss" "poor intake", "bedbound" (even though the patient is able to sit in a reclining chair), "incontinent of bowel and bladder", "dependent for all ADL", and "sleeping more." Such statements do not indicate a need for recertification.

f.  The CTIs for this patient resemble the CTIs written for Patient G. The narratives have little or no data to support recertification and are not individualized. The CTIs for this patient also contain mistakes, including her age, her score on a functional assessment, her medications and her weight (they do not mention her weight gains). The CTIs also do not reflect the Hospice Plan of Care as written. The CTI for June 7, 2016 to August 5, 2016 contains no narrative from the certifying physician.

In summary, on information and belief, Amedisys provided custodial care for a chronically ill, elderly female, but billing Medicare for hospice care that this patient was never eligible to receive. As noted, this patient was on service with Amedisys for 1016 days and recertified repeatedly with no actual evidence of terminal illness. On information and belief, based on this patient's length of stay and Relator's knowledge of hospice reimbursement rates, Amedisys would have fraudulently billed Medicare in an amount totaling approximately $182,880 for the cost of hospice care that was non-reimbursable.

39

70. Patient I, a Medicare patient, was an elderly female who was admitted to Hackensack Center in 2014 at a Routine LOC with a terminal diagnosis of Chronic Obstructive Pulmonary Disease ("COPD"). She did not fit the criteria for admission or recertification because she was not using oxygen frequently, she had a normal resting respiratory rate and heart rate, her vital signs were within a normal limits, and she utilized bronchodilators less than four times a day (she only required them twice a day). Patient I was admitted to hospice care with a functional assessment score of 50 and a score of less than 40 is required. It is documented in the file that in 2016, Patient I had a stroke which resulted in her death three days later. That stroke was unrelated to her fraudulently documented terminal diagnosis of COPD. Some of the evidence supporting the conclusion that Patient I did not qualify for hospice care includes:

a. The Medication Report for this patient reflects only one documented medication change during 2015 and two medication changes during 2016. This would indicate that her condition was stable and did not require frequent medication interventions to maintain comfort and decreased respiratory effort.

b. The Vital Signs Trending report for this patient indicates that most vital signs do not appear on the report. There are no recorded Pulse Oximeter reports that could be used as evidence or data to support the diagnosis of COPD with decreasing oxygen levels. This would suggest that the oxygen levels were not decreasing as they ordinarily would in a person with end stage COPD.

c. The Hospice Plan of Care for this patient is not individualized and does not indicate that Patient I is terminally ill. The medical interventions and goals reflected in the Plan of Care are vague and visit documentation is missing.

d.   The CTIs contained in the file are inadequate to document terminal illness. Their

narratives are brief with little or no documentation that is disease specific.  The

certifying hospice medical director, Richard Rosenbluth, M.D., states on the CTIs that

Patient I is dyspneic (*i.e.,* has difficulty breathing), when documentation in the file

reflects that the patient's respiratory and heart rates are within normal limits.

In summary, on information and belief, Amedisys provided custodial care for a chronically ill,

elderly female, but billing Medicare for hospice care that this patient was never eligible to

receive.  This patient was on Amedisys hospice care for 697 days and Relator estimates that

Medicare was fraudulently billed approximately $125,460 for these services.

## VI.   CAUSES OF ACTION

### COUNT ONE
### (Federal False Claims Act)
### 31 U.S.C. § 3729(a)(1)(A)

71.   Relator repeats and realleges each and every allegation contained in paragraphs 1

through 70 above as though fully set forth herein.

72.   This is a claim for treble damages and penalties under the False Claims Act, 31

U.S.C. §§ 3729, *et seq.*, as amended.

73.   By virtue of the acts described above, Defendant knowingly presented or caused to

be presented, false or fraudulent claims to officers, employees or agents of the United States

government for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

74.   The United States, unaware of the falsity of the claims made or caused to be made

by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant'

unlawful conduct.

75.   By reason of the Defendant' acts, the United States has been damaged, and

continues to be damaged, in a substantial amount to be determined at trial.

76.   Additionally, the United States is entitled to the maximum penalty of $11,000 (and up to $21,563 per claim for claims made after November 2, 2015) for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

## COUNT TWO
### (Federal False Claims Act)
### 31 U.S.C. § 3729(a)(1)(B)

77.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 70 above as though fully set forth herein.

78.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted facts, that were material to false or fraudulent claims, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

79.   The United States, unaware of the falsity of the records, statements and material omissions made or caused to be made by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant' unlawful conduct.

80.   By reason of the Defendant' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

81.   Additionally, the United States is entitled to the maximum penalty of $11,000 (and up to $21,563 per claim for claims made after November 2, 2015) for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

42

## COUNT THREE
## (Federal False Claims Act)
### 31 U.S.C. § 3729(a)(1)(G)

82.  Relator repeats and realleges each and every allegation contained in paragraphs 1 through 70 above as though fully set forth herein.

83.  By virtue of the acts described above, Defendant knowingly caused the Government to make overpayments to Defendant for non-reimbursable hospice services, which overpayments became "obligations" and "false claims" by operation of law and within the meaning of the False Claims Act when they were retained, converted and never repaid by Defendant. 31 U.S.C. § 3729(b)(3); 42 U.S.C. § 1320a-7k(d).  By these actions, Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

84.  The United States, unaware of the falsity of the records and statements and of the Defendant' concealment and unlawful conduct, was denied an opportunity to claim and demand return of the money and property to which it was legally entitled.

85.  By reason of the Defendant' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

86.  Additionally, the United States is entitled to the maximum penalty of $11,000 (and up to $21,563 per claim for claims made after November 2, 2015) for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator, acting on behalf and in the name of the United States of America, demands and prays that judgment be entered against Defendant under the Federal False Claims Act as follows:

(1)    That Defendant cease and desist from violating 31 U.S.C. §§ 3729 *et seq.* as set forth above;

(2)    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 (and not less than $10,781 and not more than $21,563 per claim for claims made after November 2, 2015), for each violation of 31 U.S.C. § 3729;

(3)    That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d); and

(4)    That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

(5)    That Relator recover such other relief as the Court deems just and proper.

44

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a

trial by jury.

Dated: October 13, 2016

By: _____

Geoffrey R. Kaiser, Esq. (GK-6991)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556-0926
Tel. (516) 357-3161

Attorney for Plaintiff-Relator
 Ellyn D. Ward

45